## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OHIO CARPENTERS' PENSION FUND, ELECTRICAL WORKERS PENSION FUND LOCAL 103 I.B.E.W., and SAN BERNARDINO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., COOPERATIEVE RABOBANK U.A. (F/K/A COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK U.A.), and RABO SECURITIES USA, INC.,<br><br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Electrical Workers Pension Fund Local 103 I.B.E.W. ("IBEW Local 103"), and San Bernardino County Employees' Retirement Association ("SBCERA") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, file this Complaint against Defendants Deutsche Bank AG ("Deutsche Bank"), Deutsche Bank Securities Inc. ("DBSI"), Cooperatieve Rabobank U.A. (f/k/a Cooperatieve Centrale Raiffeisen-Boerenleenbank U.A.) ("Rabobank"), and Rabo Securities USA, Inc. ("RSUI") (collectively, "Defendants"). Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Plaintiffs' claim arises from Defendants' and their co-conspirators' anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of Euro-denominated

bonds issued by European governments ("European Government Bonds" or "EGB") and sold and purchased throughout the United States from at least as early as January 1, 2005 through at least December 31, 2016 (the "Class Period").

2.     European Government Bonds are sovereign debt issued by European central governments that have adopted the euro as their official currency, including Austria, Belgium, Finland, France, Germany, Italy, Portugal, Greece, Ireland, the Netherlands, and Spain, among others (collectively, the "Eurozone").  Major purchasers and holders of European Government Bonds include U.S. institutional investors, mutual funds, hedge funds, pension funds, and insurance companies.

3.     European Government Bonds are issued in the primary market, and Defendants and their co-conspirators subsequently trade them in the secondary market.  In a competitive secondary market, dealers would compete for customers based on the prices they quote for the purchase and sale of European Government Bonds.  The smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) quoted to the customer, the better and more competitive the prices are for customers.

4.     Defendants and their co-conspirators, however, agreed to fix the bid-ask spreads of European Government Bonds in the secondary market.  No dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors.

5.     Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications through email and private online chatroom communications.  Through such communications, these traders secretly exchanged commercially sensitive information and

coordinated their pricing and trading strategies before agreeing to prices that they would quote to their customers for European Government Bonds.[1]

6.      In furtherance of the scheme, Defendants and their co-conspirators exchanged commercially sensitive information, including the prices they offered to customers, and coordinated on trading strategies.  This conduct benefitted the Defendants, to the detriment of investors in the market, including Plaintiffs and the Class.

7.      On December 6, 2022, the European Commission (the "Commission") publicly announced that it issued a Statement of Objections to Deutsche Bank and Rabobank stating "that between 2005 and 2016 the two banks, through some of their traders, exchanged commercially sensitive information and coordinated their pricing and trading strategies when trading [European Government Bonds] in the secondary market in the European Economic Area ('EEA')."[2]  A Statement of Objections reflects the Commission's preliminary view that the banks violated European competition laws.  If the violation is confirmed, the Commission can levy fines of up to 10% of each bank's global revenue.  Deutsche Bank confirmed that the Commission has granted it conditional immunity because it has "'proactively cooperated with the European Commission in this matter.'"[3]  In order to qualify for immunity from the Commission, Deutsche Bank is required to admit its participation in the cartel.[4]

---

[1]      *See* Press Release, European Commission, *Antitrust: Commission sends Statement of Objections to Deutsche Bank and Rabobank over Euro-denominated bonds trading cartel case* (Dec. 6. 2022), https://ec.europa.eu/commission/presscorner/detail/en/ip_22_7409.

[2]      *Id.*

[3]      Foo Yun Chee, *Deutsche bank, Rabobank hit with EU antitrust charge over bond cartel*, REUTERS (Dec. 6, 2022), https://www.reuters.com/business/finance/eu-antitrust-regulators-charge-deutsche-bank-rabobank-over-bond-cartel-2022-12-06/.

[4]      *See Commission Notice of Immunity from fines and reduction of fines in cartel cases*, 2006 O.J. (C 298) 17, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52006XC1208(04)&from=EN ("The Commission will grant immunity from any fine which would otherwise have been imposed to an undertaking disclosing its participation in an alleged cartel . . . .").

8.     Defendants' and their co-conspirators' conduct injured investors in European Government Bonds.  Defendants and their co-conspirators have inflated the prices at which they sold European Government Bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiffs and members of the Class (defined below).  Thousands of investors have transacted billions of dollars' worth of European Government Bonds in the United States directly with Defendants and their co-conspirators.  Plaintiffs, on behalf of themselves and all others similarly situated, seek damages as a result of the unlawful conduct, trebled as provided by law.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction under §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).  This Court also has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1337(a).

10.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

11.     Each Defendant conducts business in this District itself or through its subsidiaries and affiliates as agents, as well as through branch offices and trading hubs located in this District, as described below.

12.     This Court has personal jurisdiction over each Defendant because, as described below, these Defendants played an integral role in conducting substantial European Government Bond promotion, marketing, trading, and sales in this District and in the United States continuously throughout the Class Period and derived substantial profits from these activities.

13.     As alleged below, a substantial part of the events giving rise to Plaintiffs' claim occurred in this District and the United States.  Defendants and their co-conspirators agreed to fix the prices of European Government Bonds that Defendants distributed into the United States for sale to investors located in this District and throughout the United States.

14.     Defendants, both on their own and acting through their subsidiaries and affiliated entities as agents, purposefully availed themselves of this forum by, *inter alia*: (a) directing European Government Bond sales and trading personnel to solicit investors for billions of dollars' worth of price-fixed European Government Bond transactions in this District and throughout the United States; and (b) collecting unlawful overcharges from investors in this District and throughout the United States.

15.     During the Class Period, the European Primary Dealers Association (the "EPDA") was the premier trade association for European Government Bond primary dealers, composed of the 20 largest primary dealers.  As of 2012, 25 banks were designated as Association for Financial Markets in Europe ("AFME") Primary Dealer Members.  Only the largest European Government Bond primary dealers were designated AFME Primary Dealer Members.  Defendants are members of the EPDA and were active participants in this trade association.  As of 2008, the EPDA reported that its members cumulatively traded more than 85% of all volume in the European Government Bonds market.

16.     Most entities that are designated European Government Bond primary dealers are part of a global bank's fixed income trading and sales networks.  These networks include fixed income sales employees who manage relationships with customers and provide market information and trade recommendations, as well as traders who determine prices quoted to investors for specific categories of fixed income products.  Large global banks also employ staff members

responsible for ensuring that (a) the banks meet regulatory requirements so that they can execute fixed income transactions with customers located in different jurisdictions and (b) these transactions are accompanied by the appropriate trade documentation.  Banks use these networks to trade European Government Bonds with investors in major financial markets, including New York.

17.     Defendants Deutsche Bank AG and Coöperatieve Rabobank U.A. (collectively, the "Primary Dealer Defendants") were designated European Government Bond primary dealers during the Class Period.  Traders employed by the Primary Dealer Defendants were responsible for determining prices quoted to investors in European Government Bond transactions, including hundreds of millions, if not billions, of dollars' worth of transactions that these entities executed directly with investors in the United States.

18.     The Primary Dealer Defendants purposefully exploited the U.S. market for European Government Bonds in at least five ways.  ***First***, when a salesperson employed by a Defendant or affiliated entity received an order from a customer to purchase or sell a European Government Bond, the salesperson requested a price quote from a Primary Dealer Defendant's trader.  When traders made pricing decisions, they knew the identity and location of the customer requesting a quote.  Thus, when the Primary Dealer Defendants' traders quoted fixed prices for European Government Bonds to investors in the U.S. market as more particularly alleged below, they intentionally restrained competition in the U.S. market for European Government Bonds.

19.     ***Second***, unlike an exchange-based market like the stock market, the European Government Bond market is a relatively opaque, over-the-counter ("OTC") market in which Defendants must interact with customers directly to secure business.  Each Primary Dealer Defendant purposefully availed itself of the U.S. market for European Government Bonds by

sending trade recommendations, trade ideas, targeted price levels at which to execute trades, research, and information about the Primary Dealer Defendant's inventory to sales personnel assigned to cover the U.S. market.  Because these same traders were simultaneously carrying out a conspiracy to fix the prices of European Government Bonds, these acts constituted purposeful availment of the U.S. market.  Specific examples of efforts to exploit the U.S. market for European Government Bonds are alleged for each Defendant in this section, below.

20.     *Third*, each Primary Dealer Defendant acquired European Government Bonds in the primary market, colluded on the prices at which these bonds were sold to Plaintiffs and the Class in the secondary market, and distributed these bonds into the United States.

21.     *Fourth*, each Primary Dealer Defendant collected funds, including overcharges from their price-fixing conspiracy, from customer accounts located in the United States.

22.     *Fifth*, each Primary Dealer Defendant charged fixed prices in the U.S. market to investors located here.  By quoting fixed prices in the U.S. market and collecting the resulting overcharges from investors located here, each Primary Dealer Defendant purposefully availed itself of the U.S. market for European Government Bonds.

23.     The Primary Dealer Defendants, either themselves or through an affiliated entity that was part of the banks' fixed-income trading and sales network, had substantial fixed-income trading and sales operations in this District.  From these desks, Defendants' banks promoted, marketed, and sold European Government Bonds to investors located in this District and throughout the United States.

24.     Figure 1 below shows that Defendants had U.S.-based dealer affiliates headquartered in this District that helped to promote, market, and sell sovereign bonds, including European Government Bonds, to investors located in this District and throughout the United States.

**Figure 1 – Headquarters of AFME Primary Dealer Members'**
**U.S.-Based Dealer Affiliates**

| AFME Primary Dealer Member | U.S. Dealer Affiliate and Its Headquarters |
|---|---|
| Deutsche Bank AG | Deutsche Bank Securities Inc. New York, NY |
| Coöperatieve Rabobank U.A. | Rabo Securities USA, Inc. New York, NY |

25.     Defendants also focused on customers in critical geographic markets by designating certain geographic locations in which they maintained significant fixed income trading and sales operations as hubs.  As shown in Figure 2, Defendants designated the New York metropolitan area as a U.S. hub for their global fixed income trading and sales operations.

**Figure 2 – Locations of AFME Primary Dealer Members' Fixed Income Trading Hubs**

| AFME Primary Dealer Member | Fixed Income Trading and Sales Hubs |
|---|---|
| Deutsche Bank AG | **New York**, London, Frankfurt, Sao Paulo, Dubai, Singapore, Hong Kong |
| Coöperatieve Rabobank U.A. | **New York**, Utrecht, London, Nairobi, Singapore, Shanghai, Hong Kong, Sydney, Sao Paulo, Buenos Aires |

26.     Accordingly, Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

**A.     Deutsche Bank Purposefully Availed Itself of the U.S. Markets for European Government Bonds**

27.     Deutsche Bank AG ("Deutsche Bank") operates a U.S. branch, licensed by the New York State Department of Financial Services, at 1 Columbus Circle New York, NY 10019.

Plaintiff Ohio Carpenters purchased European Government Bonds from Deutsche Bank's New York branch during the Class Period.

28.     Deutsche Bank's traders located in its Frankfurt headquarters and London branch were responsible for determining European Government Bond prices charged to investors located in the United States, including transactions that Deutsche Bank entered into with Plaintiffs.

29.     Deutsche Bank conducts substantial activities on behalf of Deutsche Bank Group's (consisting of Deutsche Bank and its subsidiaries and affiliates) "Corporate Banking & Securities" business.   In this capacity, during the Class Period, Deutsche Bank served as a European Government Bond primary dealer from its Frankfurt headquarters and branch office in London. Deutsche Bank distributed European Government Bonds into the United States to U.S.-based affiliates that were also organized under Deutsche Bank Group's Corporate Banking & Securities business, such as Defendant Deutsche Bank Securities Inc., to trade with investors in the secondary market.

30.     Because it conducts substantial business in the United States on its own and through its subsidiaries, Deutsche Bank is required under the Dodd-Frank Act to submit triennial Resolution Plans to the Federal Reserve Board.

31.     Deutsche Bank's domestic operations led to significant sales of European Government Bonds to customers in the United States, including Plaintiffs Ohio Carpenters, SBCERA, and IBEW Local 103.

32.     Accordingly, throughout the Class Period, Defendant Deutsche Bank purposefully availed itself of the U.S. market for European Government Bonds.

**B.     Coöperatieve Rabobank U.A. Purposefully Availed Itself of the U.S. Market for European Government Bonds**

33.     Coöperatieve Rabobank U.A. ("Rabobank") traders located in its Utrecht headquarters and London branch were responsible for determining European Government Bond prices charged to investors located in the United States, including transactions that Rabobank entered into with Plaintiffs SBCERA and Ohio Carpenters.

34.     Rabobank also operates a U.S. branch, licensed by the New York State Department of Financial Services, at 245 Park Avenue New York, NY 10167.

35.     Rabobank conducts substantial activities on behalf of Rabobank Group's (consisting of Rabobank and its subsidiaries and affiliates) "Wholesale Banking" division.  In this capacity, during the Class Period, Rabobank served as a European Government Bond primary dealer from its Utrecht headquarters and branch office in London.  Rabobank distributed European Government Bonds into the United States to U.S.-based affiliates that were also organized under Rabobank Group's Wholesale Banking division, such as Defendant Rabo Securities USA, Inc.

36.     Because it conducts substantial business in the United States on its own and through its subsidiaries, Rabobank is required under the Dodd-Frank Act to submit triennial Resolution Plans to the Federal Reserve Board.

37.     Rabobank's domestic operations, either directly or through its U.S. subsidiaries, led to significant sales of European Government Bonds to customers in the U.S., including Plaintiffs Ohio Carpenters and SBCERA.

38.     Accordingly, throughout the Class Period, Rabobank purposefully availed itself of the U.S. market for European Government Bonds.

## THE PARTIES

*Plaintiffs*

39.     Plaintiff Ohio Carpenters' Pension Fund ("Ohio Carpenters") is a Taft-Hartley multi-employer pension fund located in Ohio that provides retirement, disability, and survivor benefits to its participants and beneficiaries.  Ohio Carpenters transacted in European Government Bonds issued by Germany, Greece, Italy, and Ireland directly with one or more of the European Government Bond cartel members, including Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and Cooperatieve Rabobank U.A. (f/k/a Cooperatieve Centrale Raiffeisen-Boerenleenbank U.A.).  As a direct and proximate result of Defendants' collusive activities, Ohio Carpenters was injured in its business or property.

40.     Plaintiff Electrical Workers Pension Fund Local 103 I.B.E.W. ("IBEW Local 103") is a defined-benefit plan located in Dorchester, Massachusetts.  IBEW Local 103 manages more than $1 billion in assets on behalf of over 8,000 members and beneficiaries.  During the Class Period, IBEW Local 103 transacted in European Government Bonds issued by Italy, France, and Germany directly with Deutsche Bank AG.  As a direct and proximate result of Defendants' collusive and manipulative activities, IBEW Local 103 was injured in its business or property.

41.     Plaintiff San Bernardino County Employees' Retirement Association ("SBCERA") is a public pension plan that provides retirement, disability, and death benefits on behalf of approximately 42,000 members and beneficiaries.  SBCERA serves 17 employers throughout California and invests more than $10 billion in assets.  SBCERA was established on January 1, 1945.  During the Class Period, SBCERA transacted in European Government Bonds issued by Belgium, Finland, France, Germany, Greece, Ireland, Italy, Portugal, and Spain, and directly with one or more of the European Government Bond cartel members, including Deutsche Bank AG, Deutsche Bank Securities Inc., and Cooperatieve Rabobank U.A. (f/k/a Cooperatieve Centrale

Raiffeisen-Boerenleenbank U.A.).  As a direct and proximate result of Defendants' collusive activities, SBCERA was injured in its business or property.

*Defendants*

### The Deutsche Bank Defendants

42.  Defendant Deutsche Bank AG is a German public limited company with its principal place of business located at Taunusanlage 12, 60325 Frankfurt am Main, Germany.

43.  Deutsche Bank Group organizes its activities on a "business segment" basis.  Its fixed income sales and trading operations, including its European Government Bond sales and trading operations, are organized under its "Corporate Banking & Securities" business segment.

44.  Employees within the Corporate Banking & Securities business segment market, price, and sell fixed income products, including European Government Bonds, to clients such as large global corporations, financial institutions, and U.S.-based businesses.

45.  During the Class Period, Deutsche Bank served as a European Government Bond primary dealer.

46.  During the Class Period, Deutsche Bank priced and executed European Government Bond transactions directly with investors in the United States, including Plaintiffs Ohio Carpenters, IBEW Local 103, and SBCERA.

47.  Defendant Deutsche Bank Securities Inc. ("DBSI") is a Delaware corporation with its principal place of business located at 1 Columbus Circle, New York, NY 10019.

48.  DBSI is Deutsche Bank Group's U.S. broker-dealer, registered with the U.S. Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

49.     During the Class Period, DBSI sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States, including Plaintiff Ohio Carpenters.

**The Rabobank Defendants**

50.     Defendant Coöperatieve Rabobank U.A. (f/k/a Cooperatieve Centrale Raiffeisen-Boerenleenbank U.A.) ("Rabobank") is a Dutch excluded liability cooperative with its principal place of business located at Croeselaan 18, 3521 CB Utrecht, The Netherlands.

51.     Rabobank organizes its activities on a "division" basis.  Its fixed income sales and trading operations, including its European Government Bond sales and trading operations, are organized under its Wholesale Banking division.

52.     Employees within the Wholesale Banking division market, price, and sell fixed income products, including European Government Bonds, to clients such as large global corporations, financial institutions, and U.S.-based businesses.

53.     During the Class Period, Rabobank served as a European Government Bond primary dealer.

54.     During the Class Period, Rabobank priced and executed European Government Bond transactions directly with investors in the United States, including Plaintiffs Ohio Carpenters and SBCERA.

55.     Defendant Rabo Securities USA, Inc. ("RSUI") is a Delaware corporation with its principal place of business located at 245 Park Avenue, New York, NY 10167.

56.     RSUI is Rabobank Group's U.S. broker-dealer, registered with the SEC and FINRA.

57.     During the Class Period, RSUI sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States.

58.     Various other entities and individuals known and unknown to Plaintiffs at this time participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged in this Complaint.

## FACTUAL BACKGROUND

### A.     European Government Bond Market

59.     The Eurozone is a monetary union comprised of a group of European nations that coordinate economic, fiscal, and monetary policy through a central bank, the European Central Bank, and use a common currency, the euro.

60.     Government entities in the Eurozone issue debt in the form of bonds, which are typically used to fund ongoing and future operations.  European Government Bonds are issued on the primary market and subsequently traded on the secondary market.

61.     Examples of European Government Bonds include French "OATs" (Obligations Assimilables du Trésor) (bonds), Italian "BTPs" (Buoni del Tesoro Poliannuali) (bonds), Belgian "OLOs" (Obligations Lineaires), Portuguese "OTs" (Obrigacoes do Tesouro), Spanish "BONOS" (Bonos del Estado), and German Bundesanleihen or short "Bunds" (10-30 year bonds).

62.     European Government Bonds are treated as a single class of debt securities due to Eurozone members' common monetary policy, common currency, common membership criteria, highly integrated financial market, high degree of economic interdependence, common governance with respect to financial regulation, common central bank, high degree of common systemic risk, and implicit backing in default.  For the same reasons, European Government Bond dealers generally organize their trading and sales businesses so that the same team of traders are responsible for determining pricing for European Government Bonds issued by different Eurozone members.  Defendants organized their European Government Bond business in this manner.

14

63. Eurozone members developed the "Euro convergence criteria" that all prospective members must meet before joining the Eurozone to ensure that new members meet Eurozone standards and to further the goal of creating an integrated financial market. All new Eurozone members must establish that they have a comparable: (a) degree of inflation; (b) ratio of government budget deficit to gross domestic product; (c) ratio of outstanding government debt to gross domestic product; and (d) long-term interest rates to existing Eurozone members prior to joining the Eurozone.

64. To achieve economic integration, Eurozone members established several centralized bodies to create and implement monetary policy. For example, the European Council is responsible for deciding on the main policy orientations for the Eurozone, while the European Central Bank is responsible for implementing monetary policy. Eurozone members also agree to deficit and debt limits that apply to all Eurozone members through these centralized bodies.

65. Eurozone members created the European Central Bank with the mission "to safeguard liquidity and promote European financial integration." The European Central Bank defined "financial integration" as follows:

> [T]he market for a given set of financial instruments or services [is] to be fully integrated when all potential market participants in such market (i) are subject to a single set of rules when they decide to deal with those financial instruments or services, (ii) have equal access to this set of financial instruments or services, and (iii) are treated equally when they operate in the market.

66. Following their economic integration, the yield on bonds, or return that an investor receives from a bond, from different Eurozone sovereigns began to converge closer together and the market began pricing them as closer substitutes.

67. By March 2007, the European Central Bank reported that the European Government Bond market was "highly integrated." It concluded that "yields in the government

bond [*i.e.*, European Government Bond] market . . . are increasingly driven by common factors."[5] The European Central Bank also concluded that the introduction of the euro and the adoption of a common monetary policy for Eurozone members, among other factors, had caused yields on European Government Bonds from the different Eurozone members to "converge[] . . . towards 1, the level of perfect integration."[6]

68.     Global holdings of European Government Bonds were approximately $8 trillion (€6.3 trillion) as of 2012.  The United States is a prominent market for European Government Bonds, with hundreds of billions of dollars in trading volume annually.

**B.     European Government Bond Primary Market**

69.     European Government Bonds are typically sold in auctions sponsored by European governments' ministries of finance within the Eurozone.  Governments delegate the issuing of bonds to their treasury department and, more specifically, to the debt management office. Although less common, European Government Bond offerings can also be made through syndication, in which a group of banks underwrites and conducts the initial sales of European Government Bonds.

70.     The sale of European Government Bonds during the auction (or syndication) is known as the "primary market."  Depending on the country, these auctions either allocate bonds at a single price to all those who bid above a certain level (known as "single price auction") or to each bidder in descending price order until the supply in that offering runs out (known as "multi-price" auctions).  For example, in the single price auctions used for 10-year Italian bonds, the bonds are allocated to the primary dealer that bids the highest price first and then continues in

---

[5]     *Financial Integration in Europe*, EUROPEAN CENTRAL BANK, at 13 (March 2007), https://www.ecb.europa.eu/pub/pdf/fie/financialintegrationineurope200703en.pdf?1470741bc6dcc84cb69ab158c75f5a7e (emphasis omitted).

[6]     *Id.*

descending order until the supply in that issuance is exhausted.  The bid at which supply runs out sets the price known as the "stop out price" – and this is the price paid by every bidder allocated bonds in the auction.  Multi-price auctions (such as those for French OATs), in contrast, do not set a single price for all auction participants but rather allocate bonds to dealers in descending price order at the price they bid.

71.     To ensure active participation in their auctions, European Government Bond issuers typically select a relatively small group of banks to serve as "primary dealers" of the European Government Bonds.  These primary dealers control a significant amount of European Government Bonds issued in auctions.  Often, the same banks act as primary dealers for multiple issuers' European Government Bonds.

72.     Figure 3 below identifies each Eurozone country and the Defendants served as primary dealers of European Government Bonds in that country during the Class Period.

**Figure 3 – European Government Bonds Primary Dealers**

|  | Austria | Belgium | Finland | France | Germany | Greece | Ireland | Italy | The Netherlands | Portugal | Slovakia | Slovenia | Spain |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deutsche Bank | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Rabobank |  |  |  |  | X |  |  |  | X |  |  |  |  |

73.     Typically, the banks are selected as primary dealers based on the following criteria:

(a)     their experience in trading sovereign debt and long-term commitment to participating in the sovereign debt market;

(b)     their ability to make markets for investors in the post-auction or "secondary market";

(c)     their financial strength, which includes their credit rating, capitalization, and appetite for risk; and

(d)       their general ability to promote an active trading market for a country's European Government Bonds.

74.    Primary dealers are generally required, at each auction, to bid a minimum percentage of the full offering.  The minimum bid requirement is usually determined as the ratio of the total number of primary dealers to the full offering – *e.g.*, if there are 10 primary dealers, each primary dealer must bid at least 10% of the total offering.  This is to ensure that in the event that no one outside of the primary dealer group bids in a given auction, all of the auctioned European Government Bonds will still be purchased by the primary dealers.  It also ensures that primary dealers receive a continuous supply of newly issued European Government Bonds to trade with investors.  Primary dealers are not, however, guaranteed to win that portion of bonds for which they bid.  The allocation depends on the prices they submitted at auction, as discussed above.

75.    Prior to each European Government Bond auction, there is a relatively active forward market – known as the "when-issued" market – where dealers (and to a much lesser extent, customers) can offer price quotes to buy or sell the to-be auctioned European Government Bond.  One to two weeks prior to an auction, a European Government Bond issuer will announce a date for the upcoming bond auction, along with all the characteristics of the bonds to be offered, *e.g.*, ISIN, coupon, maturity, and amount.  The bonds can then be quoted and traded immediately in the when-issued market.  A dealer or customer buying the when-issued European Government Bond is obligated to take delivery of the newly issued bond and pay the price under the terms of the transaction.  A dealer or customer selling the when-issued European Government Bond is obligated to make delivery of the newly issued bond and accept payment.  Trading in the when-issued market takes place up until the time of the auction.

76.     European Government Bond customers typically do not have access to real-time pricing in the when-issued market.  As a result, customers only see static, non-executable bids and offers.  Dealers, by contrast, can see real-time bids and offers and thus are able to learn the demand for, and how other dealers value, the new issue.  Dealers can learn the market yield, which in a normally functioning market would form the basis for the auction-determined yield.

77.     The primary dealers provide valuable information to European Government Bond issuers.  Primary dealers often acquire and possess significant amounts of information about client demand and order flows in their roles as market makers.  Certain investors, including pension funds and life insurance companies, have long-dated liabilities on their balance sheet that they need to hedge.  European Government Bonds have longer durations and lower credit risk than corporate bonds and therefore can more effectively hedge certain forms of long-term liabilities.  As these bonds mature, and as the assets under management grow, there is a constant need for bond proceeds to be re-invested to keep the average maturity of the portfolio constant, month-in, month-out.

78.     Through the information primary dealers receive about customer demand, primary dealers can judge interest in the auction, and in turn, the likely trading activity for auctioned securities in the secondary market.  Given the wealth of information primary dealers acquire through their customers, European Government Bond issuers rely heavily on primary dealers' knowledge of investor appetite to better understand what type of offering will attract the most interest in the issuance.  Indeed, often prior to the auction, the European Government Bond issuers will discuss with primary dealers how the market is evaluating an offering.

79.     European Government Bond issuers monitor the performance of primary dealers in the auctions, ranking them based on how aggressively they bid in the auction – *i.e.*, whether

primary dealers will bid large amounts of the auctioned bonds at high prices. Each issuer's debt management office publishes a ranking of primary dealers according to how well they are deemed to have met the obligations of that primary dealership. Primary dealers that consistently obtain the largest portions of auctioned European Government Bonds are ranked higher than dealers that do not.

80.     Primary dealers are economically incentivized to maintain a high ranking because it gives them opportunities to participate in even more lucrative transactions with the issuer. One such lucrative opportunity for top-ranked primary dealers is serving as a lead manager of a syndicated issuance. In France, for example, lead syndicate managers are appointed based on expertise, rank, and contribution to the planning and preparation of the transaction. Syndicate managers then have the responsibility and opportunity for market-making in the secondary market for the security. Top-ranked primary dealers also receive preference in derivative transactions, including entering into interest rate swap transactions with the issuers to hedge risk in the government's portfolio. Primary dealers are also incentivized to increase or maintain their primary dealer ranking to acquire investment bank advisory projects from issuers. In addition, from time to time, issuers write call options for primary dealers, the value of which increases as the auction-clearing price increases. Dealers exercising these options can obtain additional supply of the newly auctioned securities, which they could then hold or resell in the secondary market.

**C.     Trading in the European Government Bond Secondary Market**

81.     After the initial issuance of European Government Bonds in the primary market, these bonds are further traded for investing and hedging purposes among bond dealers and investors – including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments in the OTC

secondary market.  There is an active secondary market for European Government Bonds in the United States.

82.     Defendants and their co-conspirators dominate the secondary market, acting as market makers by providing liquidity to investors and standing ready to buy and sell European Government Bonds whenever an investor seeks to do so.

83.     In fact, Eurozone governments often require that primary dealers actively quote new European Government Bond issues to retain their primary dealer status.  The governments also monitor the performance of the primary dealers in terms of the volumes they trade and quote in the secondary market.  For example, France and Italy rank the performance of their primary dealers in the secondary market in terms of the number and quality of bid and ask quotes and the volume of trades made.  It is not uncommon for central governments to demand that primary dealers provide minimum amounts of activity in the secondary market.  If a primary dealer fails to do so, it risks receiving a lower ranking or being dropped as a primary dealer altogether.

84.     Customers seeking to buy or sell European Government Bonds may contact one or more banks, such as Defendants or another primary dealer, and request pricing for a particular European Government Bond.  The bank will quote the price for a European Government Bond in terms of a "bid" or an "ask," which are usually set in terms of basis points (one basis point equals 1/100 or 1%).  The bid represents the price at which a dealer will purchase the European Government Bond; the ask represents the price at which a dealer will sell the European Government Bond.  The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to buy or sell the European Government Bond in the future at better prices than it is quoting at the time to its customer.

85.     As is typical in many financial markets, trading of European Government Bonds is done through telephonic and, increasingly, electronic means.  Salespersons at the dealer banks take orders and then relay them to bond traders at the banks' trading desks so that they can be filled.

86.     Rational customers want to buy low and sell high.  Banks, including Defendants and their bond traders, compete for customers based on the bid and ask prices they offer, and, in turn, the spread between them.  The narrower the bid-ask spread, the more competitive the prices. A bank can gain customers and business by offering a narrower bid-ask spread than its competitors. Conversely, if a bank widens the bid-ask spread – by either lowering the bid or raising the ask (or both) – it would likely lose customers to rivals offering narrower spreads.  Only through collusion can a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

**D.      Structure of Defendants' European Government Bond Businesses**

87.     Defendants' European Government Bond trading and sales personnel are housed within each bank's respective fixed income division.  An entity within this division serves as a primary dealer for European Government Bonds issued by multiple Eurozone countries.  Traders employed at the primary dealer entity are also responsible for determining pricing for European Government Bond trades with investors.  Defendants Rabobank and Deutsche Bank performed this function on behalf of their respective banking groups during the Class Period.

88.     The primary dealer entity acquires European Government Bonds from issuers in the primary market.  The traders who undertake primary dealing responsibilities are typically located in the same office.  When primary dealers acquire European Government Bonds, they place them into inventory and distribute them, as needed, to fill customer orders, through the bank's sales and trading network to trading hubs located in major financial centers, including in the United States.  Sales personnel at these trading hubs help their respective European Government Bond

primary dealers by interacting with investors, managing client relationships, and receiving and implementing customer European Government Bond orders from trading desks.  As described above, Defendants' U.S. entities performed this function in the United States during the Class Period.

89.    For example, when a salesperson in the United States sells a European Government Bond to a customer, a trader at the primary dealer entity is responsible for determining the price charged to the customer and executes an internal transaction from the primary dealer's inventory to send the European Government Bond to the bank's U.S. trading desk, which then delivers the bond to the customer.  Through these internal transactions, the primary dealer entities distribute European Government Bonds into the United States through their respective U.S. desks to U.S. investors.

90.    Defendants' primary dealer entities, Rabobank and Deutsche Bank, transacted European Government Bonds directly with customers located in the United States.  On other occasions, Defendants also distributed European Government Bonds to U.S. customers through their U.S.-based broker-dealer affiliates.

**E.    Pricing of European Government Bonds**

91.    As with other bonds, the prices of European Government Bonds are stated in terms of the bond's par value, coupon, maturity date, and yield.  A bond's par value is its face value, payable on the bond's maturity date.  A bond's coupon is the interest rate that the bond issuer must pay an investor.  Coupons are paid to the bond-holder periodically – usually every 6 or 12 months – until the bond reaches maturity.  Yield is a figure that shows the return that an investor receives by holding the bond to maturity.

92.    Bond prices can be quoted as a function of the bond's par value or its yield.  A bond with a par value of €1,000 may sell at a discount of 2%, or €980.  European Government Bonds

are also quoted in fractions of a euro (*e.g.*, 1/32).  In the example above, a €1,000 par value bond may be quoted at "98-23."  The "98" reflects the "handle" and the "23" reflects the number of "32nds" (*i.e.*, 23/32).  The bond's price off of par, can be determined by dividing 23 into 32 (0.71875) and adding that to the handle of "98," which provides the bond's price as a percent of the bond's €1,000 face value – *i.e.*, 98.71875% or €987.1875.  A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

93.    A bond's price can also be quoted in terms of its yield.  Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by Figure 4 below:

**Figure 4 – Relationship Between Bond Price and Yield**



94.    This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates.  As market interest rates increase, bond prices decrease.  Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons, prices, and terms to maturity.

## DEFENDANTS' WRONGFUL CONDUCT

95.     Defendants and their co-conspirators fixed bid-ask spreads on customer orders for European Government Bonds in the post-auction, secondary market.  Defendants orchestrated their bid-ask spread fixing primarily through non-public, invitation-only, multi-dealer electronic chatrooms, where Defendants' traders discussed customer orders, the bid and ask prices offered to customers seeking a quote, and the prices of executed trades.  Primary dealers are particularly well placed to see order information and estimate bond demand, allowing them to disclose information that may decrease uncertainties regarding the demand and thus the price of the bonds in the secondary market.  Client order information is highly sensitive, and sharing this information with competitors is considered grounds for termination.[7]

96.     Exchanging this information is prohibited, yet profitable for the Defendants, because it alerts horizontal competitors to the prices at which customers are valuing bonds, allowing conspirators to raise their offers (in the case of a customer purchase) or lower their bids (in the case of a customer sale)[8] to collect additional profits.  This conduct caused a corresponding loss to Defendants' customers, who unknowingly transacted at prices fixed by Defendants instead of prices set by supply and demand.

97.     Absent an agreement to fix bid and ask prices, no individual bank could afford to engage in such conduct unilaterally.  To do so would result in that bank losing substantial trading business to competitors offering more competitive pricing.  Further, consistently quoting non-

---

[7]     *See, e.g.*, Patrick Gower, *Barclays Trader Fired Amid FX Probe Is Third to Lose Lawsuit*, BLOOMBERG BUSINESS (May 26, 2017), https://www.bloomberg.com/news/articles/2017-05-26/barclays-trader-fired-amid-fx-probe-is-third-to-lose-lawsuit#xj4y7vzkg.

[8]     An artificially raised ask price (or artificially lowered bid price) increases the difference between the bid and the ask (*i.e.*, the bid-ask spread).  *See* Part IV.E above, and Part VI.B below.

competitive bid and ask prices would risk the bank's lucrative position as a primary dealer in European Government Bonds.

98.     As was the case in other financial market cartels, through electronic communications, Defendants' traders exchanged confidential information about their customers' identities and orders (including, among other things, size, direction, and price). By exchanging this sensitive customer information, the conspiring traders could coordinate the bid and ask prices they offered to their respective customers in the secondary market. Defendants' European Government Bond traders communicated with each other frequently. The repetitious nature of Defendants' traders' private chatroom discussions enabled them to both coordinate on pricing and effectively police their conspiracy. A conspiring bank's trader who failed to adhere to agreed-upon pricing could quickly be identified and barred from any further participation in the chatrooms. Accordingly, the European Government Bond traders had little incentive not to adhere to their agreement.

99.     By communicating with one another about aligning the prices and spreads they quoted to investors, Defendants also discouraged investors from comparing prices. Shopping around for better pricing was ultimately a pointless endeavor because the quotes received from one cartel member would be substantially similar to those offered by the other cartel member. From the customer's perspective, the matching quotes suggested that the prices offered by any one cartel member were competitive. Unbeknownst to the customer, however, these prices were actually the product of collusion between the conspiring banks' European Government Bond traders.

100.    As a result of Defendants' price-fixing agreement, investors, including Plaintiffs and the Class, either paid artificially high prices for European Government Bonds they bought or

received artificially low prices for the European Government Bonds they sold, causing Plaintiffs and the Class injury to their business or property.

## INVESTIGATION BY THE EUROPEAN COMMISSION

101.    For years, the European Commission has been investigating potential cartel behavior in various sectors of the financial market, including the European Government Bond market.

### A.    The Commission Issues Statement of Objections to Defendants Deutsche Bank and Rabobank

102.    On December 6, 2022, the Commission sent a Statement of Objections to Defendants Deutsche Bank and Rabobank informing them "of its preliminary view that they breached EU antitrust rules by colluding to distort competition when trading Euro-denominated Sovereign, SSA (Supra-Sovereign, Foreign Sovereign, Sub-Sovereign/Agency), Covered and Government Guaranteed bonds."  Euro-denominated Sovereign bonds are European Government Bonds.[9]

103.    Specifically, the Commission stated that "between 2005 and 2016 the two banks, through some of their traders, exchanged commercially sensitive information and coordinated their

---

[9]    The Commission's press release defines the other types of bonds at issue in the Commission investigation as follows:

> SSA bonds: an umbrella term for three types of bonds: (i) Supra-Sovereign bonds issued by supranational institutions or agencies whose mandate extends across national borders, such as the European Investment Bank; (ii) Foreign Sovereign bonds issued by governments under a law different from their own and/or in a different currency other than their own; (iii) Sub-Sovereign/Agency bonds issued by governmental or government-related entities below the level of the central government, such as regions or municipalities, government-owned banks, or social security facilities.

> Covered bonds: issued by credit institutions that are secured by a protected pool of high-quality assets, such as mortgage loans or public sector debt.

> Government Guaranteed bonds: offer a secondary guaranteed interest where principal payment will be made by a government authority upon default of the issuer.  These bonds were issued in response to the 2008 financial crisis and for a limited period of time.

*See supra*, n.1 (emphasis omitted).

pricing and trading strategies when trading these bonds in the secondary market in the European Economic Area ('EEA')." It further stated that "[t]hese exchanges would have taken place mainly through emails and online chatroom communications."[10]

104.   According to the Commission, such conduct "would violate EU rules that prohibit anticompetitive business practices such as collusion on prices and other trading conditions (Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement)."[11]

105.   Both Article 101 (formerly Article 81 of the Treaty Establishing the European Community) and Article 53, in their respective provisions on price collusion, prohibit "all agreements between undertakings, decisions by associations of undertakings and concerted practices which . . . directly or indirectly fix purchase or selling prices or any other trading conditions."

### B.     The European Commission Investigative Process and Procedure

106.   According to the Commission, a Statement of Objections is issued once fact-finding is complete to "inform[] the parties concerned in writing of the objections raised against them."[12] Further, the Commission prepares the Statement of Objections "in view of the nature and structure of the final decision that might be adopted."[13]

107.   To investigate a potential action, the Commission's investigative powers allow it to: (a) send information requests to companies believed to have engaged in anticompetitive conduct; (b) conduct on-site inspections of a company's premises; (c) examine a company's

---

[10]      *Id.*

[11]      *Id.*

[12]      *See supra*, n.1

[13]      *Antitrust Manual of Procedures*, EUROPEAN COMMISSION (Nov. 2019), https://ec.europa.eu/competition/antitrust/antitrust_manproc_11_2019_en.pdf.

business records; (d) remove copies of those records from the premises; and (e) ask members of staff or company representatives questions relating to the subject matter and purpose of the inspection and record the answers.

108.    The Commission's investigation process is outlined in Figure 5, below.

**<u>Figure 5 – European Commission's Case Investigation Process</u>**



109.    If the Commission confirms the violation, the target banks could be subject to fines equal to 10% of the banks' global revenues.

110.    Deutsche Bank disclosed that it has been granted "conditional immunity" and that it had been "'proactively cooperat[ing] with the European Commission in this matter.'"[14] Defendant Rabobank has also stated that it was cooperating with the Commission's investigation.[15]

111.    The Commission's grant of "conditional immunity" to Deutsche Bank is significant.

_____

[14]    *See supra*, n.3.
[15]    *Id.*

> The Commission will grant immunity from any fine which would otherwise have been imposed to an [entity] *disclosing its participation in an alleged cartel* . . . if that [entity] is the first to submit information and evidence which in the Commission's view will enable it to: (a) carry out a targeted inspection in connection with the alleged cartel; or (b) find an infringement of Article 81 EC in connection with the alleged cartel.[16]

Such information and evidence includes, among other things:

- A "corporate statement" that includes "[a] detailed description of the alleged cartel arrangement, including for instance its aims, activities and functioning; the product or service concerned, the geographic scope, the duration of and the estimated market volumes affected by the alleged cartel; the specific dates, locations, content of and participants in alleged cartel contacts, and all relevant explanations in connection with the pieces of the evidence provided in support of the application."[17]

- "Other evidence relating to relating to the alleged cartel in possession of the applicant or available to it at the time of the submission, including in particular any evidence contemporaneous to the infringement."[18]

112.    By the Commission's own regulations, a recipient of immunity must admit its participation in a cartel in violation of European competition law.

**C.    The European Commission Previously Found that Seven Other Banks Conspired to Fix Prices in the European Bond Market During the Relevant Time Period**

113.    This is not the Commission's first investigation into cartel behavior involving European debt markets, including European government bonds.  On May 5, 2021, the Commission released its provisional, 248-page non-confidential decision following an extensive investigation

---

[16]        *See supra*, n.4 (footnote omitted).

[17]        *Id.* (footnote omitted).

[18]        *Id.*

... 

detailing a multi-year conspiracy among major commercial banks – including Bank of America, NatWest (formerly RBS), Natixis, Nomura, UBS, UniCredit, and WestLB – in which traders at these banks exchanged commercially sensitive information and coordinated trading and bidding strategies in the primary and secondary markets for European Government Bonds in violation of European competition laws.

114.    Among the types of commercially sensitive information exchanged by traders included "pricing elements, positions and/or volumes and strategies for specific counterparties related to individual trades of [European Government Bonds] on the secondary market."[19] Specifically, bank traders exchanged information concerning:

> prices/spreads, deal volumes, customer details and orders for the EGB recently traded at or being offered and details of respective competitor trading positions and trading strategies in light of these positions.  Such exchanges on the prices/spreads (including mid-prices), deal volumes, customer details and orders of [European Government Bonds] which are quoted on [dealer-to-dealer] and [dealer-to-customer] platforms, informed the banks about their competitors' trading strategies and enabled them to adjust their positions and strategy in light of the information exchanged and/or respect each other's positions and strategy.[20]

115.    These traders effectuated their conspiracy primarily through the use of multi-dealer chatrooms.  However, the conversations were often facilitated through other means, including direct telephone communications.

116.    In its May 2021 decision, the Commission identified hundreds of communications reflecting traders' exchange of commercially sensitive information, coordination of bidding strategies, and attempts to fix, rig, and/or manipulate the prices of European Government Bonds in the primary and secondary markets.  As the Commission observed:

> [t]hrough their contacts, . . . the participating banks coordinated their conduct in EGB and ***directly and indirectly fixed purchase or selling prices, altered the***

---

[19]    European Commission, *CASE AT.40324 – European Government Bonds, Commission Decision* (May 20, 2021), https://ec.europa.eu/competition/antitrust/cases1/202142/AT_40324_7971056_3662_3.pdf.

[20]    *Id.* (footnote omitted).

***normal trading conditions of the market and shared the market*** (such as when exchanging confidential information about specific counterparties, as well as information volumes in order to obtain the desired allocations at auctions).[21]

117.    The Commission imposed fines exceeding $450 million against Nomura, UBS, and UniCredit for their participation in the cartel.  Fines would have exceeded $900 million had certain entities not received credit for their cooperation in the investigation.

118.    Upon information and belief, traders at Deutsche Bank and Rabobank used tactics similar to those used by the banks in the earlier investigation by the Commission and in doing so, corrupted the prices of European Government Bonds purchased and sold in the secondary market.

119.    Further, the Commission's investigation against Deutsche Bank and Rabobank is "the third investigation conducted by the Commission involving cartels affecting the market for bonds trading.  In April 2021, the Commission fined three investment banks a total of € 28 million for participating in a US Dollar-denominated SSA bonds trading cartel."[22]

## THE EUROPEAN GOVERNMENT BOND MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A EUROPEAN GOVERNMENT BOND CARTEL

120.    Features of the European Government Bond market support the inference of concerted action by Defendants to fix, raise, maintain, stabilize, or otherwise manipulate the prices of European Government Bonds.

121.    ***First***, the European Government Bond market has high barriers to entry.

122.    The Bank for International Settlements, a policy and research organization owned by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers in OTC markets like the European Government Bond market include:

> a sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets,

---

21    *Id.* (emphasis added) (footnotes omitted).
22    *See supra*, n.1.

including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities.[23]

123.    **Second**, the structure of the secondary market for European Government Bonds was susceptible to collusion.

124.    The European Government Bond market is also characterized by very large, relatively infrequent customer transactions.  Researchers reported that European Government Bond trading was "dominated by large players executing large transactions" during the Class Period.[24]  Further, the relatively lower volume of transactions, as compared to other fixed income products, allowed Defendants to monitor more easily and to police each other's quoting behavior.

125.    Additionally, investor participation in the European Government Bond market is marked by fairly routine, predictable trading schedules.  Certain U.S. pension and investment funds holding European Government Bonds have investment mandates that require periodic rebalancing of fixed income portfolios to address fluctuations in the credit and interest rate risk of their investments.  This rebalancing can include, among other things, the purchase of newer (*i.e.*, on-the-run) European Government Bond issues and the sale of older (*i.e.*, off-the-run) European Government Bond issues.  Rebalancing generally occurs at regular monthly or quarterly intervals.  These predictable trading patterns by investors facilitated Defendants' coordination of prices to investors seeking to buy and sell European Government Bonds.

126.    **Third**, pre-trade price discovery for non-dealers in the European Government Bond market is difficult.  There is no central, all-to-all, exchange where dealers and non-dealers alike

---

[23]    *International banking and financial market developments*, BIS QUARTERLY REVIEW, at 99 (March 2015), https://www.bis.org/publ/qtrpdf/r_qt1503.pdf.

[24]    Hassen Chtourou, *Analysis of the European Government Bonds and Debt after the European Financial Crisis*, 8:2 J. OF CENTRUM CATHEDRA: THE BUS. AND ECON. RES. J., at 148 (2015).

can see bid and ask quotes in real-time, as there is for other asset classes.  Customers do not have access to the real-time price feeds available to dealers on interdealer broker platforms, like MTS or BrokerTec.  Rather, customers need to request quotes from individual dealers (including Defendants) – either electronically or through phone communication.

127.   During the Class Period, Defendants also successfully defeated transparency measures in the European Government Bond market through their trade association, the EPDA. For example, in 2007, the EDPA successfully opposed new transparency measures proposed by the European Commission that would have disclosed pricing to European Government Bond customers.  Later, in 2008, the EPDA rallied against a proposal by the Italian Treasury that would have made trading prices between Defendants and their customers for Italian European Government Bonds accessible to investors.  Acting through the EPDA, Defendants and their co-conspirators argued that "imposing more transparency could be harmful."[25]  Defendants recommended that regulators should "leave further transparency initiatives to the industry" and argued that information asymmetries (such as the inability of investors to see pricing and trading information) with respect to European Government Bond trading were a sign of an efficient European Government Bond market.[26]

128.   Defendants claimed that an opaque European Government Bond market was necessary to incentivize them to continue operating as European Government Bond primary dealers.  Thus, Defendants raised the implicit threat that transparency in the European Government Bond market would cause them to retreat from their market-making obligations and withhold

---

[25]    *SIFMA/EPDA/EHYA/LIBA/ASSOSSIM Response to CESR May 2007 Consultation Paper on Non-Equity Markets Transparency*, EUROPEAN SECURITIES AND MARKETS AUTHORITY (ESMA) (Jun. 8, 2007), https://www.esma.europa.eu/file/7643/download?token=R-NNw2jR.

[26]    *Id.*

liquidity.   But this threat masked Defendants' true motive – to protect their information asymmetry, and when advantageous, collude on prices to customers.

129.   Without access to reliable pricing information, investors like Plaintiffs were forced to turn to Defendants when transacting in European Government Bonds and to rely on Defendants to provide competitive European Government Bond pricing.   The EPDA noted that, in trades between European Government Bond primary dealers and customers, trade information is "only available to the direct counterparties to the trade."[27]

130.   Transparency enables investors to identify dealers that offer superior prices, allowing them to seek out those dealers.   Thus, transparency helps the most competitive dealers attract market share.   However, price transparency was a risk to Defendants' and their co-conspirators' cartel because it would have allowed investors to see prices charged by European Government Bond dealers not participating in the cartel.   Keeping the status quo enabled Defendants and their co-conspirators to continue dictating anti-competitive prices to uninformed investors handicapped by an inability to observe prices for European Government Bond transactions.   Had Plaintiffs and the Class been able to observe market-wide pricing, it would have been readily apparent that Defendants and their co-conspirators were charging uniform, supra-competitive prices.

131.   ***Fourth***, Defendants' conduct was contrary to their individual economic interests. For example, if a Defendant unilaterally widened its bid-ask spread prices to customers on a consistent basis, while others failed to do similarly, few would trade with that conspiring bank. Moreover, consistently failing to keep competitive spreads or make markets for customers would

---

[27]   *Price Discovery & Market Data Guide for the European Government Bonds Market*, AFME/EPDA (Jun. 2010), https://silo.tips/downloadFile/price-discovery-market-data-guide-about-afme-epda.

jeopardize a conspiring bank's privileged status as a primary dealer with European Government Bond issuers, potentially leading to its removal as a primary dealer. If a conspiring bank lost its primary dealer status, it would no longer have privileged access to information from Eurozone central banks. This would, in turn, make that conspiring bank's services less attractive to European Government Bond customers.

132.    ***Fifth***, in the absence of a conspiracy, sharing proprietary trading information was contrary to Defendants' individual economic interests. Sharing trading and pricing information would have been dangerous in the hands of true competitors during the Class Period because it would allow rival dealers to "trade ahead" of the dealer's disclosed trade in the dealer-to-dealer market. Trading ahead occurs where a dealer learns ahead of time that another market participant intends to execute a trade, and then establishes a position that will benefit from the move in the market caused by the anticipated trade. This causes the market price to move against the other market participant, benefitting the dealer who engaged in "trading ahead." Accordingly, no one Defendant would share confidential order information because an opportunistic trader at a rival dealer could capitalize on the information to the detriment of the sharing Defendant.

133.    Defendants themselves acknowledged that sharing proprietary information about planned trades and customer orders is against the economic self-interest of any rational, non-conspiring dealer and harms customers by causing inferior prices. In a position paper on price transparency that the EPDA submitted to a European regulator during the Class Period, the EPDA wrote that "the dealer (and indeed its customer) will be very concerned about other market participants being able to react ahead of the dealer trying to liquidate its position which it may have obtained in a transaction with a customer."[28]

---

[28]    *See supra*, n.25.

134.    *Sixth*, European Government Bonds traders operate in a tightly knit community. Many traders have worked at multiple dealer banks during their careers and have had repetitive dealings with each other, as European Government Bond auctions were held frequently.  These traders built friendships and networks with other dealer traders that extended beyond the office and into their respective personal lives and led them to view each other as collaborators instead of competitors.

135.    *Seventh*, there was a high level of communications among Defendants and their co-conspirators.  As the Commission found in its December 6, 2022 press release, Defendants' traders routinely exchanged commercially sensitive information and coordinated their pricing and trading strategies through electronic platforms.  As previously discussed, traders' exchange of confidential information in online chatrooms is unnecessary for the purposes of making markets and is contrary to their individual self-interest.   There are significant concerns associated with direct communications between competitors of the sort identified.  Indeed, in response to the scandals involving anticompetitive conduct in the LIBOR and foreign exchange markets (among others), many financial institutions have prohibited their employees and traders from participating in multi-dealer chatrooms.

136.    Defendants also failed to monitor these trader communications though they had the means to do so.  These oversight failures allowed employees in Defendants' European Government Bond trading and sales businesses to fix prices, share sensitive customer information, and coordinate trading strategies throughout the Class Period.

137.    *Eighth*, Defendants and their co-conspirators had the opportunity to collude through their involvement in industry trade associations, such as the AFME and EPDA.

138.    Within the AFME is the primary dealers board (the "Board"), which "addresses developments affecting the European government market specifically and aims to build consensus within the industry and acts as a bridge between financial market participants and policymakers." One of the Board's priorities is to "[a]ctively participate in industry events which focus on rates issues."[29]   Through participation on the Board, Defendants and their co-conspirators had ample opportunity to discuss issues affecting the European Government Bond market, including matters affecting the primary and secondary markets for these products.   During the Class Period, Defendants Deutsche Bank and Rabobank had representatives on the Board, as shown in Figure 6 below:

**Figure 6 – AFME Board Members**

| Primary Dealer | AFME Board Member |
| --- | --- |
| Deutsche Bank | Campbell Gilbert |
| Rabobank | Geert Kesteleyn |

139.    Prior to the creation of the AFME in 2009, European Government Bond primary dealers founded the EPDA to "advocate[] on behalf of eurozone government bond [p]rimary [d]ealers with relevant government and regulatory bodies through dialogue and market best-practices recommendations."[30]   During the Class Period, the EPDA set industry standards applicable to Defendants' European Government Bond trading and sales businesses.

140.    Defendants' high-ranking European Government Bond sales and trading personnel regularly met in person at conferences, meetings, and other events hosted by the AFME and the

---

[29]     *Primary Dealers*, AFME, https://www.afme.eu/en/divisions-and-committees/primary-deals-rates/.

[30]     *European Primary Dealers Handbook*, AFME (2015), at i, https://www.afme.eu/globalassets/downloads/publications/afme-primary-dealers-handbook-q4-2015.pdf.

EPDA.  These meetings provided another forum for Defendants' European Government Bond trading and sales personnel to establish closer relationships while discussing sensitive subjects such as European Government Bond pricing.  For example, the EPDA held annual conferences beginning in 2006 at locations throughout Europe.  Defendants' European Government Bond trading and sales personnel attended these conferences.

141.   The AFME/EPDA held an Annual European Government Bond Conference in each year of the Class Period.  Defendants' European Government Bond trading and sales personnel attended these conferences and afforded Defendants an opportunity to meet in person behind closed doors in bars, restaurants, hospitality suites, and hotel rooms adjoining the conference space.

142.   Promotional materials for the Annual European Government Bond Conference state that it is the "ONLY event of its kind!," where attendees could "[j]oin 200 senior representatives from debt management offices (DMOs), government bond investors, central banks, regulators, primary dealers, trading platforms and brokers."[31]  Each conference included speeches, roundtable and moderated panel discussions, presentations, break-out sessions, lunches, dinners, and networking sessions.

### SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' MANIPULATION OF EUROPEAN GOVERNMENT BONDS

143.   Defendants and their co-conspirators engaged in multiple similar price-fixing conspiracies in various financial markets during the Class Period, which led government investigators to find parallel deficiencies in oversight and control within Defendants' and their co-

---

[31]     *Hedge Funds*, HEDGE FUNDS, https://www.hedgeweek.com/category/event-type/hedge-funds?page=119 (last visited Dec. 9, 2022).

conspirators' trading and sales businesses.  These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

144.    These findings further support the conspiracy alleged in this Complaint because they demonstrate that Defendants and their co-conspirators had deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

145.    **FX**:  Multiple banks, including Defendant Deutsche Bank AG, failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange ("FX") market. These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order information and proprietary information on trading positions with competitors in group chatrooms with names like "The Cartel."  Deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period.

146.    Deutsche Bank AG entered into a Consent Order with the New York State Department of Financial Services ("DFS") regarding its anticompetitive conduct in the FX market. Deutsche Bank AG agreed to pay a fine of $205 million as part of the Consent Order with the DFS for violations of law, including efforts to improperly coordinate trading activity through online chatrooms, improperly sharing confidential customer information, trading aggressively to skew prices, and misleading customers.

147.    The DFS determined that from 2007 to 2013, when Deutsche Bank was the largest foreign exchange dealer in the world, Deutsche Bank repeatedly engaged in improper, unsafe, and unsound conduct in its foreign exchange business due to its failures to implement effective controls.

148.    The DFS investigation found that Deutsche Bank foreign exchange traders participated in multi-party online chatrooms where participants shared confidential information, discussed coordinating trading activity, and attempted to manipulate foreign exchange currency prices or benchmark rates.  By engaging in these activities, these traders sought to diminish competition and increase their profits by executing foreign exchange trades at the expense of customers or the wider market.

149.    The DFS investigation also discovered that certain Deutsche Bank employees sought to manipulate submission-based benchmarks for certain currency pairs.  The benchmarks, supposedly derived from an objective submission process, instead became potentially tainted when traders sought submissions premised on benefitting their own particular trading positions.  In addition, on numerous occasions, certain Deutsche Bank traders and salespeople improperly swapped customer identity and order information with competitors at other banks.  With information about the prices competitors were quoting, traders could collude to maximize their profits at customers' expense.

150.    Deutsche Bank sales staff also engaged in other improper conduct designed to benefit the bank by shortchanging customers, including "deliberate underfills" and tactics designed to secretly increase the "markup" charged to customers for trade execution.  In numerous instances, Deutsche Bank staff intentionally failed to correct, or even intentionally made, errors or misleading entries in trade execution records to keep extra profit for themselves and the bank.

151.    **LIBOR/Euribor/Yen LIBOR/Swiss Franc LIBOR**:  Government investigations and civil lawsuits revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. dollar LIBOR, Euribor, Yen LIBOR, and Swiss franc LIBOR) during the Class Period.  These investigations have led to dozens of fines and settlements for price-

fixing by banks including Deutsche Bank and Rabobank.  Regulators found that trading staff within the colluding banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

152.    According to the Justice Department, "'For years, employees at Rabobank, often working with traders at other banks around the globe, illegally manipulated four different interest rates – Euribor and LIBOR for the U.S. dollar, the yen, and the pound sterling – in the hopes of fraudulently moving the market to generate profits for their traders at the expense of the bank's counterparties . . . .'"[32]

153.    Rabobank reached settlements totaling approximately $1 billion with U.S. and U.K. authorities as to its participation in LIBOR manipulation.  Rabobank agreed to pay £105 million to the U.K. Financial Conduct Authority ("FCA"), $475 million to the Commodity Futures Trading Commission ("CFTC"), $325 million to the U.S. Department of Justice ("DOJ"), and roughly $96 million to Dutch authorities.

154.    Libor-rigging probes ended in approximately $9 billion of fines worldwide for banks, including $2.5 billion for Deutsche Bank, accused of fixing the benchmark to boost profit.

155.    **ISDAfix**:  The CFTC issued an Order filing and settling charges against DBSI for attempted manipulation of the International Swaps and Derivatives Association Fix ("ISDAfix") benchmark and requiring DBSI to pay a $70 million civil monetary penalty.  The CFTC Order found that over a five-year period, beginning in at least January 2007 and continuing through May 2012, DBSI made false reports and, through the acts of multiple traders, attempted to manipulate

---

[32]     Press Release, U.S. Department of Justice, *Rabobank Admits Wrongdoing in Libor Investigation, Agrees to Pay $325 Million Criminal Penalty* (Oct. 29, 2013), https://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty#:~:text=%E2%80%9CFor%20years%2C%20employees%20at%20Rabobank,for%20their%20traders%20at%20the.

the U.S. Dollar ISDAfix, a leading global benchmark referenced in a range of interest rate products, to benefit its derivatives positions, including positions involving cash-settled options on interest rate swaps.

156.    **USD-denominated SSA Bonds**:  A DOJ investigation into price-fixing in the U.S. dollar-denominated SSA bond market became public in December 2015.  It quickly prompted simultaneous cartel investigations by the FCA and the European Commission, and the filing of private lawsuits.  The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks and hundreds of redacted chats and transcripts that demonstrated that these banks failed to detect and deter collusive communications by trading and sales staff in their bond businesses.  In 2017, Deutsche Bank AG agreed to settle for a total of $48.5 million.

157.    **Mexican Government Bonds**: The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), imposed fines totaling 35 million pesos ($1.75 million) on seven international banks and traders for market manipulation and collusion in the government bond market.  COFECE said the banks, including Deutsche Bank, agreed to sell or buy bonds at a certain price or to not trade them at all, and these agreements "'had a direct impact on the price of the related instruments.'"[33]

## CLASS ACTION ALLEGATIONS

158.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

---

[33]    Abraham Gonzalez, *CORRECTED – Mexican watchdog fines seven international banks for bond rigging*, REUTERS (Jan. 25, 2021), https://www.reuters.com/article/mexico-banks/corrected-mexican-watchdog-fines-seven-international-banks-for-bond-rigging-idUSL1N2K01J0.

All persons or entities who purchased or sold European Government Bonds in the United States directly from Defendants from at least as early as January 1, 2005 through at least December 31, 2016 (the "Class Period").

Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

159.    Plaintiffs believe that there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

160.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for European Government Bonds in violation of the Sherman Act;

(b)    the identity of the participants in the conspiracy;

(c)    the duration of the conspiracy;

(d)    the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)    whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the Class;

(f)    whether Defendants fraudulently concealed the conspiracy's existence from Plaintiffs and the Class; and

(g)    the appropriate measure of damages sustained by Plaintiffs and the Class.

161.    Plaintiffs' claims are typical of the claims of the other Class members.  Plaintiffs and Class members sustained damages arising out of Defendants' common course of conduct in

violation of the law as described in this Complaint.  The injuries and damages of each Class member were directly caused by Defendants' wrongful conduct.

162.    Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs are adequate representatives of the Class and have no interests adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

163.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

164.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

165.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants, Class members, or the public record.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT**

166.    Defendants concealed their wrongdoing in manipulating the prices of European Government Bonds sold to investors.  Thus, the statutes of limitations relating to the claim for

relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private unregulated conduct.

167.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for European Government Bonds.

168.    Neither Plaintiffs nor Class members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing the Commission's Statement of Objections concerning the Euro-denominated bonds.  Plaintiffs and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.  In fact, Defendants' collusive activities were so well-hidden that regulators in Europe and elsewhere were unaware of such conduct for years.

169.    Only after the Commission publicly announced its preliminary findings of price collusion in the European Government Bonds market against Deutsche Bank and Rabobank on December 6, 2022 did Plaintiffs have a sufficient basis to investigate Defendants' possible collusion.

170.    Reasonable due diligence could not have uncovered the conspiracy because: (i) Defendants' trading positions and trading strategies in the European Government Bonds market are not publicly available; (ii) the bilateral, non-exchange traded nature of European Government Bond transactions make observing anticompetitive behavior in that market exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of the European Government Bonds market makes it exceedingly difficult for an ordinary person to assess improprieties; (iv) neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of European

Government Bonds; and (v) Plaintiffs and members of the Class were not parties to Defendants' and their co-conspirators' communications in private chatrooms in which they agreed to fix the prices of European Government Bonds.

171.    Defendants also took active steps to conceal evidence of their misconduct from Plaintiffs, the Class, government regulators, and the public by holding out their activities in the European Government Bonds market as good-faith market-making conduct.  Upon information and belief, this included, among other things, the use of code words and instructions to keep certain discussions private or to refrain from memorializing in writing any incriminating discussions. Indeed, the European Commission found that such tactics were used by European Government Bond traders.[34]  Indeed, each Defendant's code of conduct represented that its operations were above board, providing a false sense of security to unwitting investors:

(a)    ***Deutsche Bank***.  Deutsche Bank's Code of Conduct states that "employees at all levels comply with applicable antitrust laws" and that such compliance "is a key priority of the bank."  Among the practices described as violating the antitrust laws were "agreements and practices that restrict competition, trading in concert with a competitor, agreements with competitors on pricing," and "facilitating the exchange of competitively sensitive information."  Further, Deutsche Bank states that "[i]t is our policy to comply with all laws which prohibit anti-competitive conduct in the countries in which we operate."[35]

---

[34]    *See supra*, n.19, ¶445 ("[T]he banks, through their traders, were, or ought to have been, aware of the sensitivity of the information exchanged and the illegitimate nature of the conduct in which they were participating. This is indicated by the traders' use of specific language, including sometimes code words, in attempts to conceal the conduct.").

[35]    Deutsche Bank Group Code of Conduct, at 15, https://investor-relations.db.com/files/documents/ documents/code_of_business_conduct_and_ethics_for_deutsche_bank_group.pdf?language_id=1&kid=code-of-conduct.redirect-en.shortcut.

(b)    *Rabobank*.    Under Rabobank's Code of Conduct, employees of Rabobank are required to swear that they "will comply with the laws, regulations and codes of conduct applicable to me."[36]

172.    Defendants failed to implement the proper internal controls to detect misconduct concerning price-fixing of European Government Bonds.  Such internal failures made it more difficult for Plaintiffs, the Class, government regulators, and the public to discover Defendants' misconduct.

173.    As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to implement proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about the entities and the material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations were tolled for Plaintiffs' and the Class's claims.

## VIOLATION OF 15 U.S.C. §1
## CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

174.    Plaintiffs incorporate the preceding paragraphs by reference.

175.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §§1, *et seq.*

176.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating the prices of European Government Bonds sold in the United States.

---

[36]    Rabobank Code of Conduct, at 8, https://media.rabobank.com/m/110678d42555f567/original/Rabobank-Compass-EN.pdf.

177.    This conspiracy to manipulate European Government Bonds prices caused injury to both Plaintiffs and the Class by depriving them of the benefit of competitive European Government Bonds prices reflecting true market fundamentals for some period during and following Defendants' unlawful conduct, and thus, Plaintiffs and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

178.    The conspiracy is a *per se* violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the European Government Bonds market.  There is no legitimate business justification for, nor pro-competitive benefits from, Defendants' conduct.  Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

179.    As a direct and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiffs and the Class have been injured in their business and property throughout the Class Period.

180.    Plaintiffs and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## RELIEF REQUESTED

Accordingly, Plaintiffs demand relief as follows:

(A)    That the Court certifies this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiffs be designated as Class Representatives, that Plaintiffs' counsel be appointed as counsel for the Class, and that the Court directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each and every member of the Class;

(B)     That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate §1 of the Sherman Act;

(C)     That the Court award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

(D)     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(E)     That the Court directs such further relief as it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: December 9, 2022

| **DICELLO LEVITT LLC** | **SCOTT+SCOTT ATTORNEYS AT LAW LLP** | **LOWEY DANNENBERG, P.C.** |
|---|---|---|
| *s/ Gregory S. Asciolla* | *s/ Kristen M. Anderson* | *s/ Vincent Briganti* |
| GREGORY S. ASCIOLLA | KRISTEN M. ANDERSON | VINCENT BRIGANTI |
| MATTHEW J. PEREZ | DONALD A. BROGGI | ROLAND R. ST. LOUIS, III |
| VERONICA BOSCO | MICHELLE E. CONSTON | 44 South Broadway, Suite 1100 |
| 485 Lexington Avenue | PATRICK J. RODRIGUEZ | White Plains, NY 10601 |
| Suite 1001 | The Helmsley Building | Telephone: 914-997-0500 |
| New York, NY, 10017 | 230 Park Ave., 17th Floor | Facsimile:  914-997-0035 |
| Telephone: 646-933-1000 | New York, NY 10169 | vbriganti@lowey.com |
| gasciolla@dicellolevitt.com | Telephone: 212-223-6444 | rstlouis@lowey.com |
| mperez@dicellolevitt.com | Facsimile:  212-223-6334 | |
| vbosco@dicellolevitt.com | kanderson@scott-scott.com | CHARLES KOPEL |
| | dbroggi@scott-scott.com | **LOWEY DANNENBERG, P.C.** |
| BRIAN M. HOGAN | mconston@scott-scott.com | One Tower Bridge |
| **DICELLO LEVITT LLC** | prodriguez@scott-scott.com | 100 Front Street, Suite 520 |
| Ten North Dearborn Street | | West Conshohocken, PA 19428 |
| Sixth Floor | DANIEL J. BROCKWELL | Telephone: 215-399-4770 |
| Chicago, Illinois 60602 | **SCOTT+SCOTT ATTORNEYS** | Facsimile:  610-862-9777 |
| bhogan@dicellolevitt.com | **AT LAW LLP** | ckopel@lowey.com |
| | 600 W. Broadway, Suite 3300 | |
| | San Diego, CA 92101 | |

Telephone: 619-233-4565
Facsimile:  619-233-0508
dbrockwell@scott-scott.com

DAVID R. SCOTT
AMANDA LAWRENCE
**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

**BERMAN TABACCO**

*s/ Todd A. Seaver*
JOSEPH J. TABACCO, JR.
TODD A. SEAVER
CARL N. HAMMARSKJOLD
CHRISTINA SARRAF
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: 415-433-3200
Facsimile:  415-433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com
csarraf@bermantabacco.com