UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OHIO CARPENTERS' PENSION
FUND, ELECTRICAL WORKERS
PENSION FUND LOCAL 103
I.B.E.W., and SAN BERNARDINO
COUNTY EMPLOYEES'
RETIREMENT ASSOCIATION,

                    Plaintiffs,

         – *against* –

DEUTSCHE BANK AG, DEUTSCHE
BANK SECURITIES INC.,
COOPERATIEVE RABOBANK U.A.
(f/k/a COOPERATIEVE CENTRALE
RAIFFEISEN-BOERENLEENBANK
U.A.), and RABO SECURITIES USA,
INC.,

                    Defendants.

**OPINION & ORDER**

22-cv-10462 (ER)

Ramos, D.J.:

      Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103"), and San Bernardino County Employees' Retirement Association ("SBCERA") (collectively, "Plaintiffs") bring this putative class action against Deutsche Bank AG ("DBAG"), Deutsche Bank Securities Inc. ("DBSI"), Coöperatieve Rabobank U.A. (f/k/a Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.) ("CRUA"), and Rabo Securities USA, Inc. ("RSUI").[1]  Plaintiffs allege that Defendants entered a *per se* illegal agreement in violation of Section 1 of the Sherman Act to fix and otherwise manipulate the price of European government bonds ("EGBs") sold in the United States from approximately January 1, 2005, through December 31, 2016, (the "Class Period").  *See* Second Amended Complaint ¶¶ 221–224 ECF No. 59

---

[1] Defendants DBAG and DBSI (together, "Deutsche Bank"), and CRUA and RSUI (together, "Rabobank") are collectively referred to as "Defendants."

("SAC"). Defendants are moving to dismiss the claims, alleging that (1) the conspiracy is implausible, (2) Plaintiffs lack antitrust standing, (3) the Court lacks personal jurisdiction over the foreign Defendants, and (4) Plaintiffs' claim is time-barred. Doc. 64. For the reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.

I.    BACKGROUND

    A.  Statement of Facts

    EGBs are sovereign debt securities issued by European central governments that have adopted the Euro as their official currency, including Austria, Belgium, Finland, France, Germany, Italy, Portugal, Greece, Ireland, the Netherlands, and Spain, among others (collectively, the "Eurozone"). SAC ¶ 2. EGBs are treated as a single class of debt securities because Eurozone members share a common currency, certain "convergence criteria" that aim at the development of an integrated financial market for the Eurozone, and centralized institutions that set a common monetary policy, such as the European Central Bank. *See Id.* at ¶¶ 74, 79. By March 2007, the European Central Bank observed that the EGB market was highly integrated. *Id.* at ¶ 79. As of 2012, global EGB holdings approximated $8 trillion, and the EGB holdings of United States investors consistently amounted to hundreds of billions of dollars throughout the Class Period. *Id.* at ¶ 80. EGB markets consequently rely upon large financial institutions like the Defendants to act as dealers and market makers. *Id.* at ¶¶ 89, 90, 94. Defendants play multiple roles in the EGB markets. Most notably, primary dealers acquire EGBs from government issuers in the "Primary Market," and Defendants trade those EGBs with other investors in the "Secondary Market." *Id.* at ¶¶ 3, 72. Plaintiffs claim that Defendants participated in a price-fixing conspiracy to fix prices in the "Secondary Market" during the Class Period. *Id.* at ¶¶ 4, 202.

i.  *Primary Market*

European government issuers first distribute their EGBs to institutions in the "Primary Market."  SAC ¶ 3.  Distribution typically occurs via auction, though the details of distribution may vary to some extent by government issuer.  *Id.* at ¶ 82.  Typically, issuers only select a small number of banks to serve as primary dealers of the EGBs, often with the same banks acting as primary dealers for multiple issuers.  *Id.* at ¶ 83.  As a result, these banks gain significant control over EGBs issued in auctions.  *Id.*  The premier trade association for EGBs, the Association for Financial Markets in Europe ("AFME"), listed twenty-five "Primary Dealer Members," including Defendants, in 2012.  *Id.* at ¶ 18. In 2008, members of the AFME's predecessor trade organization collectively traded 85 percent of all volume in the EGB market.  *See Id.*

ii.  *Secondary Market*

After the initial issuance in the primary market, EGBs are further traded for investing and hedging purposes among bond dealers and investors, including international banks like Defendants.  SAC ¶ 93.  There is an active secondary market for EGBs in the United States.  *Id.*  Plaintiffs allege that Defendants and their co-conspirators dominate the United States market, acting as market makers by providing liquidity to investors and standing ready to buy and sell EGBs whenever an investor seeks to do so. SAC ¶ 94.  The Secondary Market is defined by infrequent, large transactions that averaged €18 million per transaction during the Class Period.  SAC ¶ 142.  These transactions are made bilaterally over the counter, rather than through a public exchange. SAC ¶¶ 97, 144.  As a result, information on EGB trades in the Secondary Market is generally not publicly available, though Defendants are allegedly able to acquire information on EGB supply and demand through certain interdealer platforms and their relationships with EGB issuers.  SAC ¶ 144.  Plaintiffs allege that Defendants shared confidential information regarding their secondary trading through online chatrooms in order to coordinate their pricing.  *Id.*  Furthermore, Plaintiffs assert that they directly

purchased and sold EGBs with Defendants and their co-conspirators at prices fixed by those conspirators through these online chatrooms and other private communications. SAC ¶¶ 11, 51-53, 58, 66; see also Doc. 69 at 20.

Plaintiffs suggest that this conspiracy was also facilitated by the structure of Defendants' EGB trading business in which employees of multiple entities in a corporate family would frequently work together to sell the EGBs acquired by the primary dealer (i.e., by an entity within each bank's respective fixed income division). SAC ¶¶ 99–101. For example, employees of American-based broker-dealer affiliates would solicit interest from investors in the United States, and the primary dealers would determine pricing and execute internal transactions to transfer the EGBs to an affiliated American trading desk for further distribution to American investors. *Id.*

As evidence of anticompetitive coordination in the Secondary Market, Plaintiffs analyzed the difference in price between the "bids" at which Defendants would purchase EGBs and the "asks" at which Defendants would sell EGBs (the "bid-ask spread"). *See Id.* at ¶¶ 181–86. Plaintiffs allege that because the prices at which a party buys and sells the same good should be nearly the same in a competitive market, a "wider" bid-ask spread suggests Defendants anticompetitively charged much more for EGBs than they themselves paid. SAC ¶ 98. Plaintiffs analyzed the change in the average relative bid-ask spreads in Defendants' quoted prices with that of dealers within a control group and include a graph in the SAC to show the results. *See Id.* at ¶¶ 181–86, Figure 7. Plaintiffs allege that Figure 7 shows that when the conspiracy allegedly ended, Defendants' bid-ask spreads for Dutch EGBs had narrowed at a "four to five times" greater magnitude than during the Class Period. *See Id.*; Doc. 69 at 10. Because it would be economically infeasible for one dealer to buy at lower prices and sell at higher prices than its competitors in a truly competitive market, Plaintiffs allege that the significantly wider bid-ask spreads during the Class Period suggest anticompetitive conduct during that time. *Id.*

### iii. *The European Commission's Statement of Objections*

Although this conspiracy allegedly ended before 2017, Plaintiffs allege that they learned of it only after the European Commission ("EC") issued a Statement of Objections on December 6, 2022 (the "2022 Statement").[2]  *See* SAC ¶213.  A Statement of Objections reflects the EC's preliminary view that the entity or person of interest—in this case, Deutsche Bank and Rabobank—violated European Competition laws.  *Id.* at ¶ 7.  In the 2022 Statement, the EC published its preliminary view that "[Deutsche Bank and Rabobank] breached EU antitrust rules by colluding to distort competition when trading Euro-denominated Sovereign (i.e., EGBs), SSA… Covered, and Government Guaranteed bonds."[3]  *Id.* at ¶ 114.  Specifically, it states "that between 2005 and 2006, the two banks… exchanged commercially sensitive information and coordinated their pricing and trading strategies when trading [EGBs] in the secondary market[.]"  *Id.* at ¶ 7.

---

[2] Plaintiffs allege that their due diligence could not have uncovered the conspiracy.  SAC ¶ 214.  Instead, they allegedly relied on Defendant's affirmative representations, including Deutsche Bank's Code of Conduct and Ethics, which states, *inter alia*, that "[w]e conduct our business in accordance with applicable antitrust laws that are designed to advance fair competition and prohibit the misuse of market power by individual companies," SAC ¶ 217, and Rabobank's "Banker's Oath," which requires all employees to swear that they will "comply with the laws, regulations and codes" that apply to them.  *Id.*

[3] The Commission's press release defines the other bonds at issue in the Commission investigation as follows:

> SSA bonds: an umbrella term for three types of bonds:  (1) Supra-Sovereign bonds issued by supranational institutions or agencies whose mandate extends across national borders, such as the European Investment Bank; (2) Foreign Sovereign bonds issued by governments under a law different from their own and/or in a different currency other than their own; (3) SubSovereign/Agency bonds issued by governmental or government-related entities below the level of the central government, such as regions or municipalities, government-owned banks, or social security facilities.

> Covered bonds: issued by credit institutions that are secured by a protected pool of high-quality assets, such as mortgage loans or public sector debt.

> Government Guaranteed bonds: offer a secondary guaranteed interest where principal payment will be made by a government authority upon default of the issuer. These bonds were issued in response to the 2008 financial crisis and for a limited period of time.

*See* Press Release, European Commission, Antitrust: Commission sends Statement of Objections to Deutsche Bank and Rabobank over Euro-denominated bonds trading cartel case (Dec. 6, 2022), https://ec.europa.eu/commission/presscorner/detail/en/ip_22_7409 (last visited on August 5, 2024) (emphasis omitted).

"These contacts would have taken place mainly—but not exclusively—through online chatrooms." *Id.* at ¶ 115.  Additionally, Deutsche Bank has confirmed that the EC granted it conditional immunity because it has "proactively cooperated with the EC in this matter." *Id.* at ¶ 7.  Plaintiffs allege that in order for Deutsche Bank to have been granted conditional immunity from the EC, it must have admitted to their participation in the alleged cartel. *Id.* at ¶ 7.

On November 22, 2023, during the pendency of this motion, the EC issued a new press release announcing its findings ("2023 Press Release").[4]  Doc. 69 at 14; Doc. 73 at 1.  According to Defendants, the fact that the 2023 Press Release contains no mention of wrongdoing by them with respect to EGBs—only Euro-denominated SSA bonds and Government Guaranteed bonds—is illustrative of why courts in this District have found that an antitrust complaint cannot rely solely on a Statement of Objections by the EC while the EC is still investigating and before the scope and outcome of the investigation are known.  Doc. 73 at 1.  Plaintiffs allege that the 2023 Press Release nevertheless confirms that there were a high number of interfirm communications between the Defendants' traders during the Class Period, Doc. 69 at 14, and based on these exchanges, traders adjusted their price levels and trading strategies. *Id.*

    *iv.  In re European Government Bonds Antitrust Litigation*.

There was a related case in this district, *In Re European Government Bonds Antitrust Litigation*, filed March 22, 2019.[5]  *See* No. 19-cv-2601 (VM) (SDNY) ("*In re*

---

[4] According to the press release, the EC fined Rabobank €26.6 million for participating in a cartel concerning the trading of certain Euro-denominated bonds—Euro-denominated SSA bonds and Government Guaranteed bonds—together with Deutsche Bank between 2006 and 2016.  *See* Press Release, European Commission, Antitrust: Commission fines Rabobank €26.6 million over Euro-denominated bonds trading cartel (Nov. 23, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5960 (last visited on August 7, 2024).  The EC's investigation revealed that, "through some of their traders, [the two banks] exchanged commercially sensitive information and coordinated their trading and pricing strategies. *Id.*

[5] On July 29, 2024, the court in *In re EGB* granted preliminary approval of the parties' proposed settlement, and on the same day, closed the case.

*EGB*").[6]  In *In re EGB*, the same plaintiffs as in the instant case brought an action against various banks, alleging an antitrust conspiracy in violation of the Sherman act within the primary and secondary United States markets for EGBs from approximately January 1, 2007, thorough at least December 31, 2012.[7]  Doc. 1.  Like in the present case, plaintiffs in *In re EGB* also relied on a Statement of Objections.  There, the Statement of Objections was issued on January 31, 2019 (the "2019 Statement"), with the complaint filed three months later.[8]  The 2019 Statement outlined the EC's preliminary investigation results, finding:  that the defendants banks in that case[9] had "participated in a collusive scheme that aimed at distorting competition [in the European markets] when acquiring and trading European government bonds[.]"[10]  Plaintiffs in *In re EGB* used the 2019 Statement to argue that the banks had similarly conspired in restraint of trade within the United States.  *Id.*  The 2019 Statement noted a high level of interfirm communications among defendants discussing sensitive information, which plaintiffs asserted was contrary to defendants' individual self-interest and thus further evidence of collusion.  Doc. 66 ¶ 228.  In further support of their allegations of price collusion in the EGB markets, plaintiffs in *In re EGB* presented statistical information and other circumstantial evidence, including evidence that the structure of the EGB market was conducive to

---

[6] *See* 2020 WL 4273811 (S.D.N.Y. Jul. 23, 2020) ("*EGB I*"); 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ("*EGB II*"); 2023 WL 11646009 (S.D.N.Y. Sept. 25, 2023) ("*EGB III*").

[7] In addition to the Plaintiffs in this case, Boston Retirement System was also a plaintiff in *In re EGB*.  Doc. 1.

[8] European Commission, Press Release, "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en htm.

[9] The initial complaint in *In re EGB,* alleged antitrust violations by defendant banks Bank of America, N.A., Merrill Lynch International, Bank of America Merrill Lynch International Designated Activity Company, Natixis S.A., NatWest Markets plc, Nomura International plc, Nomura Securities International Inc., UBS AG, UBS Europe SE, UBS Securities LLC, UniCredit Bank AG, NatWest Markets Securities Inc., and UniCredit Capital Markets LLC.  *EGB I.*

[10] In addition to the Plaintiffs in this case, Boston Retirement System was also a plaintiff in *In re EGB*.  Doc. 1

collusion.  *See* Doc. 66.  Here, Plaintiffs make very similar arguments using the 2022
Statement.[11]

     In *In re EGB*, the court granted defendants' motion to dismiss both the third and
fourth amended complaints as to some defendants and denied as to others.[12]  *EGB I*; *EGB
II*.  Relevant to the present case, in both instances, the court held that plaintiffs' claim was
not time-barred where they sufficiently alleged that defendants' fraudulent concealment

---

[11] Plaintiffs in *In re EGB* argued that in addition to the 2019 Statement, many features of the EGB market
structure support the existence of an EGB cartel and thus the inference of a conspiracy.  Doc. 1 at 28–38.
Those features included that:  (1) it is highly concentrated, (2) it has high barriers to entry, (3) it is highly
opaque, (4) artificially widening bid-ask spreads would be contrary to any single primary dealer's economic
self-interest, (5) defendants and their co-conspirators had common motives to conspire, (6) sharing
proprietary trading information is an act against any bank's self interest in the absence of a conspiracy, (7)
there was a high level of communications among defendants and their co-conspirators, and (8) defendants
had the opportunity to collude through their involvement in industry trade associations, such as the AFME
and the European Primary Dealers Association (the "EPDA").  *Id.* at 33–38.

Similarly, Plaintiffs here argue that in addition to the EC's 2022 investigation, many features of the EGB
market structure support the existence of an EGB cartel and thus the inference of a conspiracy.  Doc. 58 at
31–47.  Those features include that:  (1) it has high barriers to entry, (2) it was susceptible to collusion, (3)
pre-trade price discovery for non-dealers in the European Government Bond market is difficult, (4)
Defendants' conduct was contrary to their individual economic interests, (5) in the absence of a conspiracy,
sharing proprietary trading information was contrary to Defendants' individual economic interests, (6)
European Government Bonds traders operate in a tightly knit community, (7) there was a high level of
communications among Defendants and their coconspirators, and (8) Defendants and their co-conspirators
had the opportunity to collude through their involvement in industry trade associations, such as the AFME
and the EPDA.  *Id.* at 38–47.

[12] In *EGB I*, defendants argued that (1) the third amended complaint was untimely, (2) the TAC failed to
adequately plead either antitrust standing or an antitrust conspiracy as to all defendants, and (3) the TAC
failed to plead personal jurisdiction over the foreign defendants.  *Id.*  The court denied the motion to dismiss
as to defendants Natixis S.A., Nomura International plc, and Nomura Securities International Inc., and
granted as to Bank of America Merrill Lynch International Designated Activity Company, Merrill Lynch
International, Bank of America, N.A., NatWest Markets plc, NatWest Markets Securities Inc., UBS AG,
UBS Europe SE, UBS Securities LLC, UniCredit Bank AG, and UniCredit Capital Markets LLC.  *Id.*

In *EGB II*, defendants argued that (1) the fourth amended complaint was untimely, (2) the FAC failed to
adequately plead either antitrust standing or an antitrust conspiracy as to all defendants, (3) the FAC failed
to tie each defendant to the alleged conspiracy, and (4) the FAC did not establish personal jurisdiction over
the foreign defendants.  *Id.*  The Court denied the motion to dismiss as to defendants Natixis S.A., Nomura
Securities International plc, Nomura Securities International Inc., UniCredit Bank AG, Citigroup Global
Markets Limited, Citigroup Global Markets Inc., Jefferies International Limited, and Jefferies LLC, and
granted as to Merrill Lynch International , Bank of America, N.A., NatWest Markets plc, NatWest Markets
Securities Inc., UBS AG, UBS Europe SE, UBS Securities LLC, UniCredit Capital Markets LLC, J.P.
Morgan Securities plc, JP Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, RBC Europe Limited,
RBC Capital Markets, and Royal Bank of Canada.  *Id.*

prevented earlier detection, particularly when plaintiffs claimed they "reli[ed] on alleged misrepresentations related to the conduct at issue." *EGB I* at 10; *EGB II* at 13. The court also held that a plaintiff is not an efficient enforcer of antitrust laws—as is required to have antitrust standing in the Second Circuit—against a defendant with whom they did not directly transact. *EGB II* at 17. Moreover, the court determined that statistical representations showing that the defendant banks, collectively, had significantly higher bid-ask spreads during the class period than the control group, was sufficient to allow a court to infer parallel conduct evincing an antitrust conspiracy, if there is sufficient additional evidence connecting each defendant, independently, to the conspiracy. *See EGB I* at 16–20; *EGB II* at 21, 22. In determining the relative weight to assign the 2019 Statement and the EC's overall investigation, the court held that "[w]hile the [EC's] investigation alone would be insufficient to support an allegation of a plausible conspiracy, it [can] constitute[] circumstantial evidence and a 'plus factor' bolstering [p]laintiffs' allegations[.]" *See EGB I at 16; EGB II* at 21.

### B. Procedural Background

Plaintiffs filed a Complaint on December 9, 2022, *see* Doc. 1, and the operative SAC on October 6, 2023, alleging an antitrust conspiracy in violation of §1 of the Sherman Act in the secondary market for EGBs. *See* Doc. 58. Defendants filed a motion to dismiss on November 6, 2023, alleging that (1) the conspiracy is implausible, (2) Plaintiffs lack antitrust standing, (3) the Court lacks personal jurisdiction over the foreign Defendants, and (4) Plaintiffs' claim is time-barred. *See* Doc. 64. Notices of supplemental authority were filed with the Court by both parties on February 7 and 22, 2024, *see* Docs. 76, 82, after the briefing was completed on the motion to dismiss. *see* Docs. 81, 83.

II.    **LEGAL STANDARD**

    **A.  Rule 12(b)(6) Failure to State a Claim**

    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corporation et al... v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50, 50 n.3 (2d Cir. 2007) (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007)), and "a complaint ... does not need detailed factual allegations" to survive a motion to dismiss, *Twombly,* 550 U.S. at 555.

    The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).  The Court therefore must ordinarily confine itself to the four corners of the complaint and look only to the allegations contained therein.  *See id.*  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and

draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable....").

Likewise, "[t]here is no heightened pleading requirement in antitrust cases." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012). However, "a plaintiff must do more than cite relevant antitrust language to state a claim for relief." *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 667 (W.D.N.Y. 2010) (citing *Todd v. Exxon Corporation*, 275 F.3d 191, 198 (2d Cir. 2001)). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id.* at 667–68 (quoting *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776, at *3 (S.D.N.Y. Dec. 14, 2004)). "[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Id.* at 668 (quoting *Heart Disease Research Foundation v. Gen. Motors Corporation,* 463 F.2d 98, 100 (2d Cir. 1972)).

## B.  Rule 12(b)(2) Personal Jurisdiction

A defendant may move to dismiss a plaintiff's claims against it for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citations omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation."

*Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt*, S.A., 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a *prima facie* showing that jurisdiction *318 exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation marks omitted)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi North America, Inc.,* 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter,* 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).

## III.    DISCUSSION

### A.  Statute of Limitation

As a preliminary matter, Defendants contend that Plaintiffs' claims are time-barred by the Sherman Act's four-year statute of limitations. Doc. 64 at 24. *See also* 15 U.S.C. § 15b. Because Plaintiffs first filed this action in 2022 but allege that the conspiracy ended on December 31, 2016, the action is presumptively untimely. Doc. 64

at 24.  However, Plaintiffs argue that the statute of limitations was tolled by Defendants' fraudulent concealment.  Doc. 69 at 23.

In the Second Circuit, the statute of limitations is tolled under a claim of fraudulent concealment when an antitrust plaintiff establishes "(1) that the defendant concealed… the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros. Inc.*, 840 F. 2d 1065, 1083 (2d Cir. 1988); s*ee also In re Merrill Lynch Limited Partnerships Litig.*, 154 F. 3d 56, 60 (2d Cir. 1998).

A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *Hinds County, Mississippi v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009). "[A] plaintiff must allege only that degree of diligence which would be reasonable in light of the allegedly concealed fraud."  *EGB I* at 11.  In the Second Circuit, "[f]raudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a reasonably diligent plaintiff would or could have known regarding the claim."  *Id.* Accordingly, "a plaintiff's failure to exhaustively turn over every stone that might conceal illicit conduct would not foreclose a finding of fraudulent concealment if the relevant facts and circumstances indicate that such efforts would be impractical or fruitless." *Id.* (quoting *Stone v. Williams*, 970 F.2d 1043, 1048–49 (2d Cir. 1992); *See also Rosenshein v. Meshel*, 688 F. App'x 60, 64–65 (2d Cir. 2017).

For purposes of this motion, Defendants do not contest that *Hendrickson*'s first two elements are met but instead argue that the SAC fails to allege that Plaintiffs "acted with reasonable diligence throughout the period [they] seek to toll."  Doc. 64 at 24 (quoting *SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 21-2697, 2023 WL 2620041, at *5 (2d Cir. Mar. 24, 2023).  While Plaintiffs do not explicitly allege that they were reasonably diligent, they do allege that their diligence could not have

uncovered the conspiracy.[13]  SAC ¶ 214.  Additionally, like the plaintiffs in *EGB I*, Plaintiffs here allege that they relied on Defendants' affirmative representations in their "codes of conduct represent[ing] that [their] operations were above board, providing a false sense of security to unwitting investors."  *EGB I* at 11; SAC ¶ 217.

Defendants, citing *Litovich v. Bank of Am. Corp.*, argue that Plaintiffs' "reliance on codes of conduct are insufficient to toll the statute of limitations…" *See* 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021); *see also In re Merrill, Band of America, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *11 (S.D.N.Y. Mar. 4, 2021).  However—as Plaintiffs point out—in *EGB I,* this Court held that "while plaintiffs cannot simply rely on the inherently self-concealing nature of a conspiracy to satisfy the first and third elements of fraudulent concealment, reliance on affirmative representations in [Defendants'] codes of conduct… may be "adequate at the pleading stage."  *EGB I* at 11–12 ("where a plaintiff relies on misrepresentations of above-board behavior, allegations about their reliance on those false reassurances can prove sufficient due diligence to withstand a motion to dismiss."*)* (citing *Hinds County Mississippi v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. 2010)).  As an example of Defendants' affirmative representations, the SAC provides part of Deutsche Bank's Code of Conduct and Ethics, which states, *inter alia*, that "[w]e conduct our business in accordance with applicable antitrust laws that are designed to advance fair competition and prohibit the misuse of market power by individual companies."  SAC ¶ 217.  Plaintiffs also point to Rabobank's

---

[13] Plaintiffs argue that their reasonable diligence could not have uncovered the conspiracy because (1) Defendants' trading positions and trading strategies in the EGB market are not publicly available; (2) the bilateral, non-exchange traded nature of EGB transactions make observing anticompetitive behavior in that market exceedingly difficult; (3) the highly specialized and esoteric nature of the different aspects of the EGB market makes it exceedingly difficult for an ordinary person to assess improprieties; (4) neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were conspiring to fix or otherwise manipulate the prices of EGBs; and (5) Plaintiffs and members of the Class were not parties to the communications of Defendants and their co-conspirators in private chatrooms in which they agreed to fix the price of EGBs.  SAC ¶ 214.  They argue that only after the European Commission publicly announced its preliminary findings of price collusion on December 6, 2022, did they have a sufficient basis to investigate Defendants possible collusion.  SAC ¶ 213.

"Banker's Oath," which requires all employees to swear that they will "comply with the laws, regulations and codes" that apply to them.[14]  *Id.*

Defendants contend that "such representations are a far cry from the 'affirmative representations' disavowing anticompetitive behavior" previously held to be sufficient in *EGB I.*  Doc. 64 at 25.  But this argument misses the mark.  Defendants are correct that in *EGB I*, the court highlighted certain defendants' codes of conduct containing language that more strongly disavowed anticompetitive behavior than in the instant case.  For example:

> "[T]hat traders should 'exercise extreme caution to avoid conduct that might violate antitrust laws or other rules prohibiting anticompetitive activities... Employees must avoid any discussion with competitors of proprietary or confidential information, business plans or topics such as pricing or sales policies -- the discussion of which could be viewed as an attempt to make joint rather than independent business decisions'; and that employees are bound by prohibitions on transactions that 'secure, by a person, or persons acting in collaboration, the price of one or several financial instruments at an abnormal or artificial level[.]'"

*EGB I* at 11 (quoting TAC ¶ 260).  Nevertheless, the court also accepted the language in the other defendants' codes of conduct more akin to the language here.  For example, defendant UBS's Code of Conduct and Ethics stated that its employees "obey[] the laws, rules and regulations of the areas where we live, work and do business" and that they "act in the interest of fair and effective competition and respect all the laws, rules and regulations that are designed to create a level playing field for all – including antitrust and competition laws." *See EGB I*, Doc. 410 ¶ 482.  Further, defendant UniCredit's Code of Ethics stated that its employees "are required to comply with the rules applicable in all countries in which the Bank operates and/or in which they [] provide their work on behalf and/or in the interest of the Bank."  Likewise, all employees "are required to conduct

---

[14] Plaintiffs allege that the "Bankers Oath" has been required by executive and supervisory boards at Rabobank since 2013, and by all Rabobank employees since the first half of 2015.  SAC ¶ 217.

their business in full compliance with any applicable competition laws and regulations." *Id.*

What was determinative in *EGB I* was not the strength of the language disavowing anticompetitive behavior but rather that plaintiffs had alleged reliance on defendants' false representations disavowing anticompetitive conduct. *Id.* at 11. Likewise, in *EGB II*, the court held that "where a plaintiff relies on misrepresentations of above-board behavior, allegations about their reliance on those false reassurances can prove sufficient due diligence to withstand a motion to dismiss." *Id.* at 13.

Likewise, while Plaintiffs' allegations of due diligence here are not extensive, they are adequate at the pleading stage. Therefore, Plaintiffs have sufficiently alleged fraudulent concealment and Defendant's motion to dismiss based on the statute of limitations is DENIED.

### B. Plaintiffs Fail to State a Claim Under § 1 of the Sherman Act

#### v. Antitrust Standing

Defendants argue that the SAC fails to plausibly plead antirust standing as required under Section 1 of the Sherman Act. Doc. 64 at 18.

"Section 4 of the Clayton Act establishes a private right of action to enforce § 1 of the Sherman Act and entitles '[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws' to treble damages for those injuries." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 490 (S.D.N.Y. 2017) (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013)). A plaintiff asserting an antitrust claim under federal law must establish antitrust standing in addition to Article III standing. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016). "In determining antitrust standing, [courts] 'assume[ ] the existence' of an antitrust violation." *Harry v. Total Gas & Power N. Am.*, Inc., 889 F.3d 104, 115 (2d Cir. 2018) (quoting *Gelboim*, 823 F.3d at 770). The Second Circuit has held that to survive a motion to dismiss, a private antitrust plaintiff must plausibly allege (1) it suffered an

antitrust injury, and (2) it is an "efficient enforcer" of the antitrust laws. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016).

*Antitrust Injury*

"Identification of an antitrust injury involves a 'three-step process' in which, first the plaintiff must 'identify the practice complained of and the reasons such a practice is or might be anticompetitive'; then the court must 'identify the actual injury the plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct'; and finally, the court must 'compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'" *In re Google Digital Advertising Antitrust Litig.*, No. 21-CV-3446 (PKC), 2024 WL 895155, at *5 (S.D.N.Y. Mar. 1, 2024) (quoting *Gatt*, 711 F.3d at 76). "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 (quotation marks omitted).

Plaintiffs assert that they purchased and sold EGBs in the secondary market, directly transacting with Defendants and their co-conspirators—"both on their own and acting through their subsidiaries and affiliated entities as agents"—at bid-ask spreads allegedly fixed by those same Defendants and co-conspirators. SAC ¶¶ 5, 6, 11, 23, 40, 49, 51-53, 61, 66; *see also* Doc. 69 at 17. As direct consumers in an alleged horizontal price-fixing conspiracy, Plaintiffs have plausibly alleged antitrust injury. *Gelboim*, 823 F.3d at 773, 777 ("[Plaintiffs] are consumers claiming injury from a horizontal price-fixing conspiracy. They have accordingly plausibly alleged antitrust injury."); *See also In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 367 (S.D.N.Y. 2019).

Defendants contend that the Court should interpret the Second Circuit in *Harry* to hold that Plaintiffs in this case lack antitrust standing because they have failed to plead facts adducing the anticompetitive effects of the specific practice at issue. *See Harry*, 889 F.3d at 115; Doc 64 at 19. The Court does not agree. As noted in *EGB I*, "the *Harry*

Court did not state that specific transactions must necessarily be pled in every antitrust case." *Id.* at 13. Plaintiffs, having "allege[ed] "that the injury they suffered was in the very market that the [D]efendants restrained," are deemed to have suffered the antitrust injury. *Eastman Kodak Co. v. Henry Bath LLC,* 936 F.3d 86, 95 (2d Cir. 2019); *see also In re GSE*, 396 F. Supp. 3d at 366–67 (rejecting challenge to antitrust standing based on failure to allege specific transactions affected where "the complaint alleges that plaintiffs participated in GSE Bond transactions during the class period with at least several of the defendants").

*Efficient Enforcer*

"A plaintiff that has plausibly alleged antitrust injury must also plausibly allege that it is an efficient enforcer of the antitrust laws." *Gelboim*, 823 F.3d at 772. Whether a plaintiff is an efficient enforcer depends on:  (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (internal quotation marks omitted). "[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." *In re Platinum & Palladium Antitrust Litig., 61 F.4th 242, 259 (2d Cir. 2023)*, *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681, 217 L. Ed. 2d 382 (2024) (quoting *Associated General Contractors of California, Inc. v. California State Council of Carpenters (AGC)*, 459 U.S. 519, 534 (1983)). "[T]he efficient-enforcer inquiry remains, fundamentally, one into proximate cause[.]" *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2d Cir. 2021); *see Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014).

Contrary to Defendant's assertions, the first two factors are met. The SAC alleges that Plaintiffs directly transacted for EGBs with Defendants, purchasing or selling them at prices fixed by Defendants and their co-conspirators. SAC ¶¶ 11, 51-53, 58, 66; *see also* Doc. 69 at 20. Therefore, there is no break in the chain of causation between the alleged conspiracy and Plaintiffs. *See Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 532–33 (S.D.N.Y. 2018) ("The first factor addresses the 'directness or indirectness of the asserted injury,' which 'requires evaluation of the chain of causation linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing.'"). Similarly, Plaintiffs, being closely positioned to the harm caused by Defendants, are best situated to vindicate their antitrust claims against them. *See In re Am. Express Anti-Steering Rules Antitrust Litig., 19 F.4th 127, 141 (2d Cir. 2021 (*quoting *Associated General Contractors of California, Inc.*, 459 U.S. at 535-36 (1983)) ("For this factor, we ask whether "[d]enying the [plaintiff] a remedy on the basis of its allegations" is "likely to leave a significant antitrust violation undetected or unremedied."); *see IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 65 (2d Cir. 2019) ("[T]he presence of plaintiffs who are better situated to vindicate the antitrust laws," though not dispositive, "is relevant to this second factor."). Although Defendants do not dispute them, the third and fourth factors are also met. Damages in this case would not be speculative and there is no concern for duplicate damages.

Defendants contend that Plaintiffs are not efficient enforcers regarding RSUI because Plaintiffs fail to allege transactions with RSUI. Doc 61 at 21. For the same reason, Defendants maintain that Plaintiff Local 103 is not an efficient enforcer regarding CRUA or DBSI. Doc 61 at 21. In *EGB I*, the court held that plaintiffs were not efficient enforcers as to three defendants "with whom they did not alleged[ly] transact, either directory or indirectly." *Id.* at 14. Although the court assumed the defendant's

involvement in the conspiracy—as they must in the antitrust standing context[15]—it determined that any misconduct would be indirect regarding plaintiffs and more direct regarding parties with whom defendants had directly transacted. *See id.* The court, therefore, held that allowing plaintiffs to proceed as efficient enforcers against those defendants "might risk speculative assessments of injury or complex apportionment of damages." *Id.* This Court agrees with that reasoning.[16] The SAC alleges no direct transactions between any of the named Plaintiffs and RSUI. Therefore, the Court is unpersuaded that Plaintiffs would be efficient enforcers against RSUI. Likewise, the SAC does not allege direct transactions between Local 103 and either DBSI or CRUA. SAC ¶¶ 51, 53. Accordingly, the Court dismisses Plaintiffs' § 1 claims against RSUI and dismisses Local 103's § 1 claims against DBSI and CRUA. All other Plaintiffs are efficient enforcers against the remaining Defendants, including claims by Ohio Carpenters and SBCER against DBSI and CRUA, and therefore their claims remain. SAC ¶¶ 51, 53, 66.

### vi. Conspiracy

Defendants argue that Plaintiffs failed to plausibly allege an antitrust conspiracy under § 1 of the Sherman Act. Doc. 64 at 6.

"Section 1 of the Sherman Act bans restraints on trade 'effected by a contract, combination, or conspiracy.'" *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 553, 127 S.Ct. 1955). To state a claim under § 1 of the Sherman Act, a complaint must contain sufficient factual matter that, taken as true, would support an inference that a conspiracy existed. *See In re Mexican Government Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 387–88 (S.D.N.Y. 2019). "The crucial

---

[15]*See Harry v. Total Gas & Power N. A., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (In determining antitrust standing, we assume the existence of an antitrust violation).

[16] The court also cited *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, 277 F. Supp. 3d 521, 558–59 (S.D.N.Y. 2017) and *FrontPoint Asian Event Driven Fund, L.P. v. Citibank*, N.A., No. 16 Civ. 5263, 2018 WL 4830087, at *5 (S.D.N.Y. Oct. 4, 2018) for the proposition that plaintiffs are not efficient enforcers against defendants with whom they did not directly transact.

question" in a case raising a violation of § 1 is "whether the challenged conduct 'stem[s] from [an] independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distribution Corp.*, 346 U.S. 537, 540 (1954)) (alteration in original).  Courts examine the existence of a conspiracy "as a whole" taking into consideration the totality of the evidence, as opposed to "dismembering it and viewing its separate parts." *Continental Ore Company v. Union Carbide & Carbon Corporation*, 370 U.S. 690, 699 (1962); *see also In re Publication Paper Antitrust Litig*, 690 F.3d 51, 65 (2d Cir. 2012).

A plaintiff may prove that an agreement exists through "direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Cenedella v. Metropolitan Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).  "Under *Twombly*, parallel conduct… may constitute circumstantial evidence of anticompetitive behavior." *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 553-54).  But a complaint that merely alleges parallel conduct among defendants—even consciously parallel conduct—does not state a claim under § 1.  *See In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2022 WL 4581903, at *11 (S.D.N.Y. Aug. 3, 2022), report and recommendation adopted sub nom. *In re Amazon.com, Inc. Ebook Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022); *see also Twombly*, 550 U.S. at 553-54.  Instead, allegations of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (international quotation marks, alteration, and citation omitted); *see also Iqbal,* 556 U.S. at 678.

Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact [sic] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. However, "[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim." *In re Mexican Government Bonds*, 412 F. Supp. 3d at 388 (emphasis in original).

In the SAC, Plaintiffs do not allege direct evidence of a conspiracy. Instead, Plaintiffs attempt to provide a basis for inferring an agreement by alleging parallel conduct, "accompanied by circumstantial evidence and plus factors." *Id.* ("An antitrust plaintiff can overcome a motion to dismiss… [if they] provide a basis for inferring an agreement by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors."); *See In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1193; *see also Bookends & Beginnings LLC v. Amazon.com, Inc.*, No. 21-CV-02584 (VF), 2022 WL 18144916, at *7 (S.D.N.Y. Aug. 24, 2022). In support of their allegations of parallel conduct, Plaintiffs proffer allegedly statistically significant evidence of collusion within the secondary market for Dutch EGBs from 2005 through 2017. SAC ¶¶ 175-186. Plaintiffs provide a chart (Figure 7) indicating that Defendants' average collective bid-ask spreads had narrowed at a "four to five times" greater magnitude than those of a non-defendant control group the year following the end of the Class Period. Doc. 69 at 10. This parallel change in quoting behavior, they argue, "suggests that Defendants conspired to maintain artificially wide bid-ask spreads during the Class Period." SAC ¶ 186.

Defendants challenge the sufficiency of Figure 7, noting that, unlike the statistical analyses provided in *EGB II*, which included additional information analyzing the market *during* the alleged conspiracy, Plaintiffs' submission here only analyzes the bid-ask spread change one year after the Class Period. *See* No. 19 CIV. 2601 (VM), 2022 WL 768680, at *1 (S.D.N.Y. Mar. 14, 2022); Doc. 64 at 13. Defendants argue that by only

analyzing the bid-ask spread change the year following the Class Period, without additional inter-Class Period evidence—like in *EGB II*—the SAC doesn't allow for any inferences regarding "collusive activity on bid-ask spreads [] for the preceding twelve-year Class [P]eriod." Doc. 73 at 5 (quoting *Hinds County v. Wachovia Bank N.A.,* 708 F. Supp. 2d 348 361 (S.D.N.Y. 2010).

In response, Plaintiffs argue that their analysis is "materially similar" to the analysis accepted by the court in *EGB II*. Doc. 69 at 10. However, Plaintiffs mischaracterize the court's analysis. Before accepting the post-class period statistics—which Plaintiffs alone proffer in the instant case—the court first analyzed plaintiffs' statistical evidence during the class period and determined that they had sufficiently "rais[ed] a reasonable inference that [d]efendants generally moved in concert to deviate from market prices during the [c]lass [p]eriod."[17] *Id.* at 19. Upon finding parallel conduct amongst the group of defendants, the court held that "to survive a motion to dismiss, [p]laintiffs must also allege…" that each defendant, independently, was involved in the parallel pricing scheme. *Id.*; *see also EGB I at* 16. Only then did the court consider the chart similar to Figure 7, proffered here. *See id.*

In the present case, Plaintiffs ask the Court to find parallel conduct during the Class Period without information sufficiently analyzing activity during that time. From the proffered post-Class Period statistics alone, the Court has no way of inferring activity during the Class Period in order to plausibly allege parallel conduct. Additionally, without sufficiently alleging parallel conduct, Plaintiffs circumstantial evidence and plus factors are insufficient alone to allow the Court to infer an agreement between Defendants. Accordingly, Plaintiffs have failed to sufficiently show circumstantial evidence of a conspiracy under § 1 of the Sherman Act by parallel conduct.

---

[17] In this initial step, the court accepted plaintiffs' data grouping the defendants together to show that they, relative to non-defendants, had acted in parallel to deviate from market prices during the alleged class period.

As an alternative to direct evidence of an agreement or parallel conduct, Plaintiffs assert that "allegations that 'evince a common motive to conspire' combined with 'a high number of interfirm communications' are adequate to plead a conspiracy." Doc. 69 at 6, 7 (quoting *In re Platinum*, 61 F.4th at 270). However, Plaintiffs mischaracterize the relationship between parallel conduct and 'plus factors,' the required additional circumstantial evidence needed to infer the existence of a conspiracy. *See Apex Oil Company v. DiMauro*, 822 F.2d 246, 253–54 (2d Cir.1987); *see In re Platinum*, 61 F.4th at 270 ("[P]lus factors [], when combined with parallel [conduct], might permit a jury to infer the existence of an agreement.") (quoting *Mayor & Council of Baltimore*, *Maryland v. Citigroup, Inc*., 709 F.3d 129, 136 (2d Cir. 2013); *see Gelboim*, 823 F.3d at 782. Without sufficiently alleging "plus factors" under § 1 of the Sherman Act, there remains an equally valid inference that the parallel conduct occurred due to independent action. *Id.* Evidence of a common motive to conspire or of a high level of interfirm communications are examples of plus factors. *See Mayor & City Council*, 709 F.3d at 136 (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, *Twombly*, 550 U.S. 544). As stated above, without a sufficient showing of parallel conduct, evidence of plus factors is insufficient to support the inference that a conspiracy existed under § 1 of the Sherman Act. *See In re Platinum*, 61 F.4th at 277; *Apex Oil Company*, 822 F.2d 254. Accordingly, Plaintiffs, having failed to establish an agreement, have also failed to state a claim under § 1 of the Sherman Act.

## C.    Personal Jurisdiction

Given Plaintiff's failure to plausibly state a claim under § 1 of the Sherman Act, the Court declines to address the issue of personal jurisdiction regarding foreign Defendants, CRUA and DBAG. *See Chevron Corp. v. Naranjo*, 667 F. 3d 232, 246, n. 17. (2d Cir. 2012) ("Ordinarily, we would address any challenge to personal jurisdiction prior to deciding the merits of the cause of action. However, in cases such as this one with multiple defendants–over some of whom the court indisputably has jurisdiction–in

which all defendants collectively challenge the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdiction claims made by some defendants."). *See also In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 267-68 (2d Cir. 2001).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED for failure to state a claim.

Plaintiffs are directed to inform the Court within twenty-one days of this Order whether they have cause to amend the SAC, or the case will be closed.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 63.


It is SO ORDERED.


Dated:    August 26, 2024
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.